**COMMONWEALTH of Pennsylvania**

v.

**Michael MOLINA, Appellant.**

Superior Court of Pennsylvania.

Argued June 7, 2011.
Filed Nov. 9, 2011.

Michael W. Streily, Deputy District Attorney and Francesco L. Nepa, Assistant District Attorney, Pittsburgh, for appellant.

Thomas N. Farrell, Pittsburgh, for appellee.

BEFORE: STEVENS, P.J., FORD ELLIOTT, P.J.E., MUSMANNO, BENDER, GANTMAN, DONOHUE, ALLEN, LAZARUS, and OLSON, JJ.

OPINION BY FORD ELLIOTT, P.J.E.:

█ Michael Molina appeals *nunc pro tunc* from the judgment of sentence entered in the Court of Common Pleas of Allegheny County following his conviction for murder in the third degree and unlawful restraint. Herein, we are asked to determine whether the Commonwealth may urge the jury to use a non-testifying defendant's pre-arrest, pre-*Miranda*[1] si-

lence as substantive evidence of his guilt. For the following reasons, we conclude it cannot as such an inference is in violation of the constitutional protections afforded by the Fifth Amendment to the United States Constitution and Article I, Section 9 of the Pennsylvania Constitution.

Molina was charged at Criminal Information No. CC 200407403 with one count of criminal homicide in violation of 18 Pa. C.S.A. § 2501 for the beating death of Melissa Snodgrass, whose badly decomposed body was discovered in a basement under a pile of debris in March of 2004. In addition, at Criminal Information No. CC 200407611, Molina was charged with one count each of criminal conspiracy, 18 Pa.C.S.A. § 903, and unlawful restraint, 18 Pa.C.S.A. § 2902. On December 13, 2006, a jury trial commenced before the Honorable David R. Cashman.

A brief summary of the facts relevant to the issue is as follows. From the time of Snodgrass' disappearance on September 7, 2003, until her mummified remains were found on March 9, 2004, Snodgrass' disappearance was handled by Detective Stacey Hawthorne–Bey of the Missing Persons Unit of the Pittsburgh Police Department. (Notes of testimony, 12/18–12 & 20/06 Vol. II at 477–479.) At trial, Detective Hawthorne–Bey testified that she initially received information that Snodgrass might be held against her will in Molina's house on Perrysville Avenue in the City of Pittsburgh. The detective went to that address and was told that Molina no longer lived there. (*Id.* at 480.) She was told by Pamela Deloe that Snodgrass was not there. (*Id.* at 483.) Detective Haw-

---

1. The term "pre-*Miranda* silence" refers generally to any silence exhibited by the defendant before law enforcement officials recite the warnings to the defendant pursuant to *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). The terms "pre-arrest" and "post-arrest" will be used to illustrate the distinction between silence exhibited before a defendant is formally arrested and after.

thorne–Bey asked Deloe to tell Molina to call her, and she gave Deloe her number.

Later the same day, Molina contacted the detective; and before she could ask him if he was aware that Snodgrass was missing, Molina told her that he did not know where she was but it was "out on the street" that he was somehow involved in her being missing and that was not true. (*Id.* at 480.) Detective Hawthorne–Bey asked Molina when he last saw Snodgrass, and he initially told the detective a year and a half ago; then moments later, Molina stated it had been approximately three months since he last saw Snodgrass. (*Id.* at 481.) The detective testified that she asked Molina to come down to police headquarters so she could further interview him and he refused. (*Id.*)

At closing argument, counsel for the Commonwealth commented on Molina's refusal to cooperate with Detective Hawthorne–Bey, and asked "Why?" (*Id.* at 580.) Defense counsel objected. The trial court overruled the objection and refused counsel's request for a curative instruction. The Commonwealth resumed and argued to the jury, "Factor that in when you're making an important decision in this case...." (*Id.* at 581.)

On December 20, 2006, the jury found Molina guilty of third-degree murder and unlawful restraint.[2] On the same date, Molina proceeded to sentencing. At No. CC 200407403, appellant was sentenced to 20 to 40 years' imprisonment for third-degree murder, and no further penalty was imposed for the unlawful restraint conviction at No. CC 200407611. No post-sentence motions were filed, nor was a direct appeal perfected.

On July 11, 2007, Molina, acting *pro se,* filed an untimely notice of appeal with regard to his convictions relating to Snodgrass. Judge Cashman reinstated Molina's direct appeal rights on September 26, 2007, and appointed Thomas N. Farrell, Esq., to represent him.[3] A three-judge panel of this court initially authored an opinion that reversed Molina's convictions. *Commonwealth v. Molina,* 2 A.3d 1244 (Pa.Super.2010). The Commonwealth filed a petition for reargument before the court *en banc.* By *per curiam* order, on October 19, 2010, this court granted reargument, withdrew its panel decision, directed the case to be listed before an *en banc* panel, and instructed the parties to re-file the briefs previously filed together with a supplemental brief or prepare and file a substituted brief. Both parties filed substituted briefs.

Herein, one issue is presented for our review. Molina contends that the trial

---

2. At the close of the Commonwealth's case, Molina made a motion for judgment of acquittal *as to homicide, and Judge Cashman granted the motion only as to second-degree murder. The defense then moved for judgment of acquittal as to the charge of conspiracy; Judge Cashman granted the motion.

For conduct separate from the killing of Snodgrass, Molina was charged at Criminal Information No. CC 200409547 with one count each of aggravated assault, simple assault, and unlawful restraint. The charges all stemmed from a March 14, 2004 incident involving another victim, Pam Deloe. On March 15, 2007, Molina pled guilty to these charges. At the aggravated assault charge at

No. CC 200409547, the court imposed a concurrent term of four to eight years' imprisonment; there were no further penalties imposed for the simple assault and unlawful restraint convictions at that Information.

3. Judge Cashman's order, however, was at Nos. 200407403 and **200409547**, not at 20407611 as had been originally sought by Molina. On October 26, 2007, Molina, through Attorney Farrell, filed a notice of appeal from the same two Criminal Informations that were included in Judge Cashman's order. Again, 200409547 has no relation to the issues raised by Molina.

court committed reversible error when it permitted the Commonwealth, over objection, to reference his pre-arrest silence in response to police questioning as substantive evidence of guilt. (Molina's substituted brief at 4.) Specifically, Molina challenges the following commentary by the prosecution at closing argument:

> Look also at what happened in terms of the police investigation in this matter. Three days after [Snodgrass] goes missing, three days after she goes missing, detectives are already knocking on [Molina's] door because of something they heard, maybe he was holding this person against [her] will, and he calls the police back and is very defensive. I mean, before a question's even asked, he denied any knowledge or any involvement with this young lady. He makes contradictory statements to the police about when's the last time that he saw her. First he says, "I saw her a year and a half ago." Then he says, "I saw her three months ago." *But most telling, I think, is the fact that the [detective] invited him. "Well, come on down and talk to us. We want to ask you some more questions about this incident, your knowledge of this young lady," especially because he made these contradictory statements. And what happens? Nothing happens. He refuses to cooperate with the Missing Persons detectives. And why?*

Notes of testimony, 12/18–12/20/06, Vol. II at 579–580 (emphasis added).

Defense counsel objected, arguing that the prosecutor's commentary was improper; both counsel approached the bench. (*Id.* at 580.) After discussing the matter, the trial court overruled Molina's objection and refused his request for a curative instruction to the jury. (*Id.* at 580–581.) The Commonwealth then resumed and argued to the jury: "Factor that in when you're making an important decision in this case as well." (*Id.* at 581.)

Molina argues that the trial court erred in overruling his objection to the Commonwealth's closing statement that the jury should consider Molina's refusal to go to the police station to discuss Snodgrass' disappearance as evidence of his guilt. Molina avers he is entitled to a new trial as the court's error violated the Fifth Amendment of the United States Constitution and also Article 1, Section 9 of the Pennsylvania Constitution as well as Pennsylvania law, including 42 Pa.C.S.A. § 5941(a). (Molina's substituted brief at 28–29.)

The Commonwealth first contends that Molina did not object to the testimony concerning appellant's pre-arrest silence at the proper stage and, thus, waived the issue. The Commonwealth argues that Molina failed to object to Detective Hawthorne–Bey's testimony when she originally stated that Molina refused to go to the police station to discuss the case. Thus, because Molina did not lodge a contemporaneous objection at the time the statement was first offered, the Commonwealth posits Molina lost his right to challenge any reference indicating that he refused to cooperate with the police. (Commonwealth's substituted brief at 12, 17–21.) We disagree and find that the Commonwealth's waiver argument misconstrues Molina's objection.

### WAIVER DUE TO A LACK OF A CONTEMPORANEOUS OBJECTION

█ We agree with the Commonwealth that it is "well-settled that a defendant's failure to object to allegedly improper testimony at the appropriate stage in the questioning of the witness constitutes waiver." *Commonwealth v. Redel,* 335 Pa.Super. 354, 484 A.2d 171, 175 (1984). However, Molina's lack of objection during

Detective Hawthorne–Bey's direct examination is not fatal to Molina's claim as he is not contending that the detective's testimony constituted prejudicial evidence that denied him a fair trial. Rather, Molina is arguing that the prosecutor's use of the detective's testimony to suggest consciousness of guilt was improper. Thus, we find that Molina contemporaneously objected to the prosecutor's statement and timely requested a curative instruction.[4]

As the trial court noted, Detective Hawthorne–Bey's testimony was originally offered to denote the extent and focus of the police investigation with regard to Snodgrass' disappearance. (Trial court opinion, 4/15/09 at 30.) The actual evidence which resulted in the detective's examination did not reveal that Molina tacitly admitted guilt, but instead it revealed the steps the police took to investigate Snodgrass' disappearance. The revelation of silence in this case was limited to its context. The trooper revealed the exchange with Molina wherein a denial of wrongdoing was immediate, and the decision to engage in further discussion with the trooper was declined. In this situation, the reference to silence was not used in any fashion that was likely to burden Molina's Fifth Amendment right or to create an inference of an admission of guilt. *Cf. Commonwealth v. DiNicola,*

581 Pa. 550, 563, 866 A.2d 329, 337 (2005) (The mere revelation of a defendant's pre-arrest silence does not establish innate prejudice; reference to silence was circumspect, and it was not used in any fashion that was likely to burden defendant's Fifth Amendment right or to create inference of admission of guilt.).

We find that the detective's testimony was originally offered for one narrow purpose—the extent and focus of the investigation relating to Snodgrass' disappearance. However, the Commonwealth later used the same testimony for a different purpose during closing argument—as evidence of Molina's guilt. While Molina did not object to the testimony for the purpose it was originally offered, Molina did promptly object and assert a claim of prosecutorial misconduct when the Commonwealth sought to indicate that such was evidence of guilt.[5] Therefore, we decline to find waiver.

## A NON–TESTIFYING DEFENDANT'S PRE–ARREST SILENCE AS SUBSTANTIVE EVIDENCE OF GUILT

We now turn to the heart of Molina's claim which is whether the prosecution made an impermissible reference to his pre-arrest silence. The Commonwealth

---

**4.** Additionally, while it is not relevant in light of our disposition of the matter, we disagree with the trial court's suggestion that Molina waived the issue of whether the trial court erred in not granting a mistrial because trial counsel did not specifically ask for it. *See Commonwealth v. McGeth,* 424 Pa.Super. 321, 622 A.2d 940, 943 (1993) ("when an objection is overruled, failing to request curative instructions or a mistrial does not result in waiver"), *affirmed,* 535 Pa. 546, 636 A.2d 1117 (1994).

**5.** We find the Pennsylvania Supreme Court case *Commonwealth v. Lettau,* 604 Pa. 437, 986 A.2d 114 (2009), distinguishable. In *Lettau,* the court found that due to a lack of

objection to the direct examination of the investigating officer or the prosecutor's closing argument referring to the defendant's pre-arrest silence, the defendant failed to preserve for appellate review a claim that his constitutional right to remain silent was violated. *Id.* at 448–449, 986 A.2d at 121. Here, a prompt objection was made during closing argument at the time the prosecution sought to use Molina's pre-arrest silence as evidence of guilt. Additionally, in *Lettau,* as in *Commonwealth v. Bolus,* 545 Pa. 103, 110, 680 A.2d 839, 843 (1996), the defendant testified and his pre-arrest silence was being used for impeachment purposes whereas Molina did not testify at his trial.

essentially argues that the prohibition against the use of a defendant's silence applies only to post-arrest or post-*Miranda* situations.

Both the United States Constitution and the Pennsylvania Constitution protect every person against being compelled to be a witness against himself or herself. U.S. Const. Amend. V; Article I, § 9. Pennsylvania courts generally interpret Article I, Section 9 of the Pennsylvania Constitution to provide the same protection as the Fifth Amendment to the United States Constitution. *See Commonwealth v. Arroyo*, 555 Pa. 125, 134–135, 723 A.2d 162, 166–167 (1999), citing *Commonwealth v. Morley*, 545 Pa. 420, 429, 681 A.2d 1254, 1258 (1996), and *Commonwealth v. Swinehart*, 541 Pa. 500, 512–518, 664 A.2d 957, 962–965 (1995). The privilege of the Fifth Amendment is protected by the now famous *Miranda* rights. *State v. Leach*, 102 Ohio St.3d 135, 807 N.E.2d 335, 337 (2004), *see also Miranda*, 384 U.S. at 479, 86 S.Ct. 1602 (holding that certain procedural warnings shall be read to a person being interrogated while in custody). Essentially, there are four relevant time periods at which a defendant may either volunteer a statement or remain silent: (1) before arrest; (2) after arrest but before the warnings required by *Miranda* have been given; (3) after *Miranda* warnings have been given; and (4) at trial. Although this case involves only pre-arrest, we touch on all four briefly in reverse order.

 The Fifth Amendment protects a defendant's decision not to testify at trial from prosecutorial comment. *See Griffin v. California*, 380 U.S. 609, 613–614, 85 S.Ct. 1229, 14 L.Ed.2d 106 (1965) (describing a state constitutional provision permitting comment on a defendant's silence at trial as a violation of the Fifth Amendment protection against self-incrimination); *Commonwealth v. Randall*, 758 A.2d 669,

681 (Pa.Super.2000) ("It is axiomatic that a prosecutor may not comment adversely on a defendant's refusal to testify with respect to the charges against him since such commentary would compromise the defendant's privilege against self-incrimination and the defendant's constitutional presumption of innocence."), *appeal denied*, 564 Pa. 707, 764 A.2d 1067 (2000). As justification for its holding, the *Griffin* court broadly reasoned, "comment on the refusal to testify is a remnant of the inquisitorial system of criminal justice, which the Fifth Amendment outlaws. It is a penalty imposed by courts for exercising a constitutional privilege. It cuts down the privilege by making its assertion costly." *Griffin*, 380 U.S. at 614, 85 S.Ct. 1229 (quotation marks, citation, and footnote omitted). Thus, a criminal defendant has the absolute right to remain silent and to not present evidence.

 Similarly, due process guaranteed by the Fourteenth Amendment protects post-*Miranda* silence for impeachment purposes. *Doyle v. Ohio*, 426 U.S. 610, 618, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976) (holding that, in light of the assurance implicit in the *Miranda* warning that silence will carry no penalty, "it would be fundamentally unfair" and a denial of due process protected by the Fourteenth Amendment to allow post-*Miranda* silence to be used in a state criminal trial "to impeach an explanation subsequently offered at trial."). Our supreme court in *Commonwealth v. Spotz*, 582 Pa. 207, 870 A.2d 822 (2005), *cert. denied*, 546 U.S. 984, 126 S.Ct. 564, 163 L.Ed.2d 474 (2005), noted:

In the seminal case of [*Doyle, supra* ] the U.S. Supreme Court determined that prosecutorial comment at trial on a defendant's post-*Miranda* silence may violate due process, and that the prosecution generally may not impeach a tes-

tifying defendant with the fact of his post-*Miranda* silence. The Court reasoned that it would be fundamentally unfair and a deprivation of due process to provide *Miranda* warnings, which imply that silence carries no penalty, and then allow the defendant's post-*Miranda* silence to be used by the prosecution as impeachment at trial. *See Doyle,* [426 U.S. at 617–18, 96 S.Ct. 2240]. In addition, the Court noted, when silence follows upon issuance of *Miranda* warnings, it may be a result of an exercise of *Miranda* rights (rather than, for example, a tacit admission); such silence, therefore, is "insolubly ambiguous." [*Id.* at 617, 96 S.Ct. 2240].

*Spotz,* 582 Pa. at 222, 870 A.2d at 830–831 (footnote omitted).[6]

The law regarding post-arrest, pre-*Miranda* silence is less clear. In *Fletcher v. Weir,* 455 U.S. 603, 102 S.Ct. 1309, 71 L.Ed.2d 490 (1982), the Court held that when a defendant has already been arrested but not yet *Mirandized* and later takes the stand in his own defense, the Fifth Amendment is not violated when the government cross-examines him concerning his post-arrest silence. However, the United States Supreme Court has not yet addressed whether post-arrest, pre-*Miranda* silence may be used as substantive evidence of guilt in the state's case.

■■■■ However, in *Commonwealth v. Turner,* 499 Pa. 579, 454 A.2d 537 (1982), the Pennsylvania Supreme Court explicitly acknowledged a more restrictive position than that taken by the United States Supreme Court in *Fletcher.* The *Turner* court held that a defendant cannot be impeached by the use of the inconsistency between his silence at the time of arrest, but before *Miranda* warnings are provided. *Id.* at 583, 454 A.2d at 539. The court established that in Pennsylvania the right to remain silent does not come into existence only when a suspect is induced to remain silent by a *Miranda* warning. "We do not think that the accused should be protected only where there is a government inducement of the exercise of the right [to remain silent]." *Id.* at 584, 454 A.2d at 540.

The defendant in *Turner* was convicted of voluntary manslaughter following a shooting in a bar. At trial, the defendant, for the first time, stated that the shooting had been in self-defense. The prosecutor questioned him as to why he had never told the police this version of events. *Id.* at 581, 454 A.2d at 538. The defense objected and moved for a mistrial. Only a cautionary instruction was given. On appeal, the supreme court reversed, finding that the prosecution could not impeach the accused with his previous silence; rather,

**6.** Ten years later, the Supreme Court held the *Doyle* rationale equally applicable where the prosecutor seeks to use evidence of a defendant's post-*Miranda* silence as evidence of the defendant's mental state. *Wainwright v. Greenfield,* 474 U.S. 284, 106 S.Ct. 634, 88 L.Ed.2d 623 (1986). In *Greenfield,* the prosecutor asked each of the two arresting officers about the multiple occasions on which the defendant invoked his right to remain silent following the *Miranda* warnings. *Id.* at 286–287, 106 S.Ct. 634. The defendant in *Greenfield* did not testify but rather pled not guilty by reason of insanity, and the prosecutor sought to show that his decision to remain silent after arrest demonstrated his mental competence. *Id.* at 287, 106 S.Ct. 634. The Supreme Court reaffirmed its reasoning in *Doyle,* citing the unfairness of promising "an arrested person that his silence will not be used against him and thereafter [] breach[ing] that promise by using the silence to impeach his trial testimony." *Id.* at 292, 106 S.Ct. 634. The Court concluded that the same unfairness would result from using post-*Miranda* silence as evidence of sanity: "[t]he implicit promise, the breach, and the consequent penalty are identical in both situations." *Id.*

defendants may only be impeached by the inconsistencies between what they say to the police and what they say at trial. *Id.* at 584, 454 A.2d at 540.

The *Turner* court acknowledged the strong disposition on the part of lay jurors to associate the right to remain silent with the admission of guilt. *Id.* Specifically, in *Turner*, our supreme court reasoned as follows:

> "We would be naive if we failed to recognize that most laymen view an assertion of the Fifth Amendment privilege as a badge of guilt." *Walker v. United States* [404 F.2d 900 (5th Cir.1968)], ... It is clear that "[t]he privilege against self-incrimination would be reduced to a hollow mockery if its exercise could be taken as equivalent either to a confession of guilt or a conclusive presumption of perjury." *Slochower v. Board of Higher Ed. of N.Y.* [350 U.S. 551, 76 S.Ct. 637, 100 L.Ed. 692 (1956)].

*Commonwealth v. Haideman*, 449 Pa. 367, 371, 296 A.2d 765, 767 (1972).

The prejudice to the defendant resulting from reference to his silence is substantial. While it is efficacious for the Commonwealth to attempt to uncover a fabricated version of events, in light of the "insolubly ambiguous" nature of silence on the part of the accused, [*Doyle*, 426 U.S. at 617, 96 S.Ct. 2240], we do not think it sufficiently probative of an inconsistency with his in-court testimony to warrant allowance of any reference at trial to the silence.

. . . .

Article 1, § 9 of the Pennsylvania Constitution provides that the accused "cannot be compelled to give evidence against himself ...," a right which is parallel to the federal constitutional right under the Fifth Amendment. We do not think that the accused should be protected only where there is governmental inducement of the exercise of the right. We acknowledge that this position is more restrictive than that taken by the United States Supreme Court in *Fletcher v. Weir, supra.* However, we decline to hold, under the Pennsylvania Constitution, that the existence of *Miranda* warnings, or their absence, affects a person's legitimate expectation not to be penalized for exercising the right to remain silent. In *Commonwealth v. Easley*, 483 Pa. 337, 396 A.2d 1198 (1979), this Court in a footnote stated:

> [W]e do not believe any reason exists to differentiate between situations where the right to remain silent is exercised following warnings and where it is exercised without warnings being given. Whether or not the exercise of the right to remain silent is induced by being advised of it at the time of arrest or is self-motivated by prior knowledge of it by the accused should not limit or extend the effect of exercising the right.

*Id.* at 341–42, n. 5, 396 A.2d at 1200–01, n. 5. *See also Commonwealth v. Singletary*, 478 Pa. 610, 387 A.2d 656 (1978).

*Turner*, 499 Pa. at 582–584, 454 A.2d at 539–540 (some citations omitted).[7]

7. Following *Turner*, our supreme court has been consistent in prohibiting the post-arrest silence of an accused to be used to his detriment. *See Commonwealth v. Costa*, 560 Pa. 95, 742 A.2d 1076 (1999) (direct question to the arresting officer as to whether the accused made any statement when arrested on child molestation charges was an impermissible reference to post-arrest silence); *Commonwealth v. DiPietro*, 538 Pa. 382, 648 A.2d 777 (1994) (even where the accused responds to some questions at the time of arrest, it is impermissible to reveal to the jury those questions to which the defendant chose to remain

The majority in *Turner*[8] did not address the United States Supreme Court case of *Jenkins v. Anderson*, 447 U.S. 231, 100 S.Ct. 2124, 65 L.Ed.2d 86 (1980), which held that reference to a defendant's pre-arrest silence does not violate due process when used to impeach the credibility of a testifying defendant. In *Jenkins*, the defendant testified at his murder trial that he killed the victim in self-defense. The defendant had surrendered two weeks after the killing. On cross-examination, the state asked him why he had not reported the incident to the police and commented on a two-week period of silence in its closing argument. *Id.* at 233–234, 100 S.Ct. 2124. The defendant argued that proof of his pre-arrest failure to give an explanation violated his Fifth Amendment privilege against self-incrimination. The *Jenkins* Court held that neither the Fifth Amendment right to be free from self-incrimination nor the Fourteenth Amendment right to due process is violated by the use of pre-arrest silence to impeach a defendant's credibility. *Id.* at 238, 100 S.Ct. 2124. The *Jenkins* Court recognized that impeachment use of silence may be valuable to the trial process and imposes very little burden on an individual's right to remain silent. *Id.*

■ In *Bolus*, 545 Pa. at 110, 680 A.2d at 843, our supreme court was "called upon for the first time to decide whether a prosecutor may refer to a criminal defendant's pre-arrest silence." The *Bolus* court expressly distinguished the *Turner* line of cases:

We find *Turner*, however, to be distinguishable from the instant matter. In *Turner*, the period of silence which was referenced by the prosecution occurred after the defendant's arrest, but prior to the time the defendant was given his *Miranda* warnings. In the instant matter, the prosecutor questioned Appellant regarding his silence which occurred months before he was arrested.

*Bolus*, 545 Pa. at 110–111, 680 A.2d at 843. When construing Pennsylvania's constitutional protection as contained in Article I, § 9, the *Bolus* court relied on *Jenkins*, 447 U.S. at 238–240, 100 S.Ct. 2124, where the Court held for the first time that if a defendant testifies, his pre-arrest silence can be used to impeach him. The *Bolus* court stated:

We find the reasoning of the United States Supreme Court's decision in [*Jenkins, supra,*] to be compelling, and hold that when a criminal defendant waives his right to remain silent and testifies at his own trial, neither the United States nor the Pennsylvania Constitution prohibit a prosecutor from impeaching a defendant's credibility by referring to his pre-arrest silence.

*Id.* at 113, 680 A.2d at 844.[9]

■ Additionally, the *DiNicola* court noted it had previously implicitly "rejected [a] conclusion that impeachment is the sole permissible purpose for which a defendant's pre-arrest silence may be referenced by the Commonwealth in a criminal trial," and concluded that, subject to an assessment of probative value versus prejudicial effect, evidence of pre-arrest si-

---

silent); *Commonwealth v. Clark*, 533 Pa. 579, 584, 626 A.2d 154, 156 (1993) (the prosecutor's open-ended question to the defendant, "Did you ever think of telling the police what happened," could not reasonably be interpreted as limited to the defendant's actions pre-arrest, thus, it violated the rule of *Turner*).

8. We acknowledge that *Jenkins* was referenced by the dissent in *Turner* authored by Justice McDermott.

9. Again, in the case of *Lettau, supra,* our supreme court reaffirmed its holding in *Bolus, supra.*

lence might be elicited for the purpose of fair response to defense arguments. *DiNicola*, 581 Pa. at 561, 866 A.2d at 335. The *DiNicola* court again discussed, in the context of an ineffectiveness claim, a reference by the prosecution to defendant's pre-arrest silence, and applied the fair response doctrine.

Instantly, the case at hand involves the use of pre-arrest silence, which occurred in response to a request by law enforcement, as substantive evidence of guilt. Molina did not testify in his own defense, so his credibility was not at issue. Nor did Molina raise the inadequacy of the police investigation as a defense. Thus, *DiNicola* and *Bolus* are inapposite. As noted by the parties herein, the issue presented has not been addressed by the United States Supreme Court or the Pennsylvania Supreme Court, and federal circuits and state appellate courts are divided on the question.[10] Although the United States Supreme Court has consistently held that the prosecution may elicit evidence of a defendant's pre-*Miranda* silence to impeach a defendant's inconsistent testimony during cross-examination,[11] it has left virtually un-

touched the issue of whether a defendant's pre-*Miranda* silence may be used during the prosecution's case-in-chief during opening and closing arguments and direct examination of witnesses.

As a result, federal courts have struggled with this issue.[12] "The First, Sixth, Seventh and Tenth Circuits have held that pre-arrest, pre-*Miranda* silence is not admissible as substantive evidence of guilt.... The Fifth, Ninth, and Eleventh Circuits, on the other hand, have held that pre-arrest, pre-*Miranda* silence is admissible as substantive evidence of guilt." [13] *See Salinas v. State*, —— S.W.3d ——, ——, No. 14–09–00395–CR, 2011 WL 903984, at *6 (Tex.App.Houston [14th Dist.] Mar. 17, 2011, no pet.) (discussing lack of governing authority on issue). The Second Circuit assumed, without deciding, that pre-arrest silence cannot be used in a prosecution's case-in-chief but found any assumed error to be harmless. *United States v. Caro*, 637 F.2d 869, 874–876 (2nd Cir.1981).

Our research reveals that several state appellate courts have held that the prosecution may not use pre-arrest, pre-*Mi-*

---

**10.** *See generally, State v. Kulzer,* 186 Vt. 264, 979 A.2d 1031 (2009).

**11.** *See Fletcher, supra; Jenkins, supra.*

**12.** The split among jurisdictions regarding the use of pre-arrest silence as substantive evidence of guilt is based upon varying views as to the extent of an arrestee's Fifth Amendment rights.

**13.** The minority of jurisdictions reason that a pre-arrest environment lacks the government coercion or compulsion implicit in an understanding of the Fifth Amendment. These courts rely heavily on the concurring opinion of Justice Stevens in *Jenkins, supra,* where he stated: "[w]hen a citizen is under no official compulsion whatever, either to speak or to remain silent, I see no reason why his voluntary decision to do one or the other should raise any issue under the Fifth Amendment." *Jenkins,* 447 U.S. at 244, 100 S.Ct. 2124 (Ste-

vens, J., concurring). Justice Stevens further opined that pre-arrest silence may be used "not only for impeachment but also in rebuttal even had [the defendant] not taken the stand." *Id.* at 244 n. 7 (Stevens, J., concurring). The courts built upon this logic to include the use of pre-arrest silence for the purpose of providing substantive evidence of guilt. *See United States v. Oplinger,* 150 F.3d 1061 (1998) (the use of pre-arrest, pre-*Miranda* silence did not violate defendant's privilege against self-incrimination or his right to due process); *United States v. Zanabria,* 74 F.3d 590 (5th Cir.1996) (evidence of defendant's pre-arrest silence is not protected by Fifth Amendment); *United States v. Rivera,* 944 F.2d 1563 (11th Cir.1991) (the prosecution may comment on a defendant's silence if it occurred prior to the time of arrest and prior to being *Mirandized* ).

*randa* silence to infer guilt as such violates a defendant's Fifth Amendment right to remain silent. *See Leach,* 807 N.E.2d at 337; *State v. Moore,* 131 Idaho 814, 965 P.2d 174 (1998); *Taylor v. Commonwealth,* 26 Va.App. 485, 495 S.E.2d 522 (1998); *State v. Easter,* 130 Wash.2d 228, 922 P.2d 1285 (1996), *Tortolito v. State,* 901 P.2d 387 (Wyo.1995); *State v. Palmer,* 860 P.2d 339 (Utah App.1993), *cert. denied,* 868 P.2d 95 (1993); *State v. Rowland,* 234 Neb. 846, 452 N.W.2d 758 (1990). However, other states have held, as the Commonwealth urges that we hold, that evidence of an accused's pre-arrest silence does not violate the Fifth Amendment in the absence of government compulsion to speak or remain silent prior to arrest.[14] *State v. Boston,* 191 N.C.App. 637, 663 S.E.2d 886 (2008), *appeal dismissed,* 362 N.C. 683, 670 S.E.2d 566 (2008); *State v. Dreher,* 302 N.J.Super. 408, 695 A.2d 672 (App.Div. 1997), *cert. denied,* 152 N.J. 10, 702 A.2d 349 (1997), *cert. denied,* 524 U.S. 943, 118 S.Ct. 2353, 141 L.Ed.2d 723 (1998), *overruled on other grounds by State v. Brown,* 190 N.J. 144, 919 A.2d 107 (2007); *State v. Houle,* 162 Vt. 41, 642 A.2d 1178 (1994).

■▬ After careful consideration of this persuasive precedent,[15] we agree with the reasoning expressed in the opinions of the First, Sixth, Seventh, and Tenth Circuits,

and today we hold that the Commonwealth cannot use a non-testifying defendant's pre-arrest silence to support its contention that the defendant is guilty of the crime charged as such use infringes on a defendant's right to be free from self-incrimination. *See Combs v. Coyle,* 205 F.3d 269 (6th Cir.2000) (use of pre-arrest silence as substantive evidence of guilt is an impermissible burden on the exercise of the Fifth Amendment privilege), *cert. denied,* 531 U.S. 1035, 121 S.Ct. 623, 148 L.Ed.2d 533 (2000);[16] *United States v. Burson,* 952 F.2d 1196 (10th Cir.1991) (the use of pre-arrest, pre-*Miranda* silence as substantive evidence of guilt violates the Fifth Amendment), *cert. denied,* 503 U.S. 997, 112 S.Ct. 1702, 118 L.Ed.2d 411 (1992); *Coppola v. Powell,* 878 F.2d 1562 (1st Cir.1989) (application of the privilege is not limited to persons in custody or charged with a crime; it may also be asserted by a suspect who is questioned during the investigation of a crime), *cert denied,* 493 U.S. 969, 110 S.Ct. 418, 107 L.Ed.2d 383 (1989); *United States ex rel. Savory v. Lane,* 832 F.2d 1011 (7th Cir.1987) (cases that have allowed introduction of defendant's pre-arrest silence rely on the rationale that the defendant submits himself to possible impeachment by taking the stand). We have found no case in which the United States

14. In so holding, those courts also adopted the rationale espoused by Justice Stevens in his concurrence to *Jenkins.*

15. In *Commonwealth v. Rosenfelt,* 443 Pa.Super. 616, 662 A.2d 1131, 1140 (1995), *appeal denied,* 544 Pa. 605, 674 A.2d 1070 (1996), this court stated:

"Although the wording of the Pennsylvania Constitution is similar in language to the Fourth Amendment of the United States Constitution, we are not bound to interpret the two provisions as if they were mirror images, even where the text is similar or identical." Furthermore, "[a]s an independent sovereign interpreting its own constitution, which preceded the Federal Bill of

Rights, no presumptive validity should be given to United States Supreme Court interpretations of the Federal Constitution." At best, such interpretations of Federal Constitutional law have only persuasive value. (Citations omitted.)

16. Although the statement by Combs referred not to his silence but to his right to an attorney, the Sixth Circuit held that "the admissibility of the statement [was] properly analyzed as a comment on pre-arrest silence." *Combs,* 205 F.3d at 279. His statement was "best understood as communicating a desire to remain silent outside the presence of an attorney." *Id.*

Supreme Court has construed the privilege against self-incrimination to allow the government's use of a non-testifying defendant's pre-arrest silence as substantive evidence of his guilt, and we decline to adopt such a construction in the present case.

 We find it of no moment whether the silence occurred before or after the arrest or before or after *Miranda* warnings were administered. The Fifth Amendment was enacted to protect against self-incrimination, whether they are in custody or not, charged with a crime, or merely being questioned during the investigation of a crime. *See Combs,* 205 F.3d at 283, 285 n. 9.[17] We clarify that our finding does not impose a *prima facie* bar against any mention of a defendant's silence; rather, we guard against the exploitation of appellant's right to remain silent by the prosecution. *See, e.g., Jones v. Stotts,* 59 F.3d 143, 146 (10th Cir.1995) (holding that "it is the prosecutor's exploitation of a defendant's exercise of his right to silence which is prohibited"). We conclude that the government may not use such silence as substantive evidence of guilt when a defendant chooses not to testify, and such use should not be limited to "persons in custody or charged with a crime"; rather, it may also not be used against a defendant who remained silent during the investigation of a crime. *See Combs,* 205 F.3d at 283, 285 n. 19.

 At the outset, we are mindful that the Fifth Amendment privilege against self-incrimination[18] must be given a liberal construction. *Hoffman v. United States,* 341 U.S. 479, 486, 71 S.Ct. 814, 95 L.Ed. 1118 (1951). "[E]ven the most feeble attempt to claim a Fifth Amendment privilege must be recognized...." *United States v. Goodwin,* 470 F.2d 893, 902 (5th Cir.1972), *cert. denied,* 411 U.S. 969, 93 S.Ct. 2160, 36 L.Ed.2d 691 (1973). In *Kastigar v. United States,* 406 U.S. 441, 92 S.Ct. 1653, 32 L.Ed.2d 212 (1972), *reh'g denied,* 408 U.S. 931, 92 S.Ct. 2478, 33 L.Ed.2d 345 (1972), the Supreme Court stated:

> The privilege reflects a complex of our fundamental values and aspirations, and

17. As Justice Marshall explained in his *Jenkins* dissent:

> I confess I find Mr. Justice Stevens' view of the Fifth Amendment incomprehensible. Apparently, under that view, a person's right not to incriminate himself exists only if the government has already attempted to compel him to do so. If no officials have tried to get the person to speak, he evidently has a duty to incriminate himself, because the reporting of crime is a civic duty and the Fifth Amendment is not applicable since the decision to speak or remain silent is, at that time, "voluntary."
>
> But the prohibition against compelled self-incrimination is another way of expressing the right not to incriminate oneself. After all, the only means of compelling a person to incriminate himself is to penalize him if he does not. Of course the voluntary decision to remain silent in the absence of any official compulsion does not "raise any issue under the Fifth Amendment," since there has been no self-incrimination at all. A voluntary decision to speak also does not

> implicate the Fifth Amendment because the self-incrimination was not compelled. But to impose a duty to report one's own crime before an official accusation has been made would itself be to compel self-incrimination, thus bringing the Fifth Amendment into play. And, as [*Griffin*] makes plain, the Constitution also prohibits the government from burdening the right not to incriminate oneself by penalizing silence. *In the present case the violation of the Fifth Amendment occurred not when the defendant remained silent, but when that silence was later used against him at his criminal trial.*

> *Combs,* 205 F.3d at 285 n. 9, quoting *Jenkins,* 447 U.S. at 250 n. 4, 100 S.Ct. 2124 (Marshall, J., dissenting) (citations omitted) (emphasis added).

18. *See generally* U.S. Const. Amend. V (stating only that "No person ... shall be compelled in any criminal case to be a witness against himself....").

marks an important advance in the development of our liberty. It can be asserted in any proceeding, civil or criminal, administrative or judicial, investigatory or adjudicatory; and *it protects against any disclosures which the witness reasonably believes could be used in a criminal prosecution or could lead to other evidence that might be so used.* This Court has been zealous to safeguard the values which underlie the privilege.

*Id.* at 444–445, 92 S.Ct. 1653 (footnotes omitted) (emphasis added).

We largely base our reasoning today on the two-part analysis applied by the Sixth Circuit in *Combs. See also Leach, supra* (relying on the analysis employed in *Combs* ). The *Combs* court determined that (1) admitting evidence of pre-arrest silence substantially undermines the very protections the Fifth Amendment was designed to provide; and (2) the government's use of pre-arrest silence in its case-in-chief is not a legitimate governmental practice. *Combs,* 205 F.3d at 285.

First, allowing the use of pre-arrest silence as substantive evidence of guilt undermines the ideology of the Fifth Amendment and would remove the privilege from anyone who was suspected of a crime.

The Supreme Court has held that the privilege against self-incrimination reflects many of our fundamental values and most noble aspirations: our unwillingness to subject those suspected of crime to the cruel trilemma of self-accusation, perjury or contempt; our preference for an accusatorial rather than an inquisitorial system of criminal justice; our fear that self-incriminating statements will be elicited by inhumane treatment and abuses; our sense of fair play which dictates a fair state-individual balance by requiring the government to leave the individual alone until good cause is shown for disturbing him and by requiring the government in its contest with the individual to shoulder the entire load; our respect for the inviolability of the human personality and of the right of each individual to a private enclave where he may lead a private life; our distrust of self-deprecatory statements; and our realization that the privilege, while sometimes a shelter to the guilty, is often a protection to the innocent.

*Id.,* quoting *Murphy v. Waterfront Comm. of New York Harbor,* 378 U.S. 52, 55, 84 S.Ct. 1594, 12 L.Ed.2d 678 (1964) (internal citations omitted).

If the prosecution were allowed to suggest guilt at trial from a defendant's silence during the pre-arrest stage, silence would essentially equate to an admission of guilt. The use of such silence would eliminate the protections of the Fifth Amendment for individuals who are not yet in police custody. *See Coppola,* 878 F.2d at 1566 ("Any refusal to speak, no matter how couched, in the face of police interrogation, raises an inference that the person being questioned probably has something to hide."). Thus, we cannot agree with the suggestion that a defendant's Fifth Amendment right against self-incrimination, like a defendant's Sixth Amendment right to counsel, attaches solely upon custodial interrogation. *See id.* at 1565 (stating that it is a "basic principle" that "application of the [self-incrimination] privilege is not limited to persons in custody or charged with a crime; it may also be asserted by a suspect who is questioned during the investigation of a crime"). Again, the Supreme Court has held that the right to remain silent can be asserted in any proceeding, "civil or criminal, administrative or judicial, investigatory or adjudicatory." *Kastigar,* 406 U.S. at 444, 92 S.Ct. 1653.

Additionally, as the Ohio State Supreme Court observed in *Leach*, if a defendant's pre-arrest silence could be admitted against him, the Commonwealth would enjoy unrestrained control over when and how its constitutional obligations will commence. *Leach*, 807 N.E.2d at 341, citing *Easter, supra*. The police, provided their questioning is non-custodial, could prolong pre-arrest interrogation in order to evade the *Miranda* protections that arrest of a defendant would trigger. The Commonwealth could then recast a defendant's pre-arrest refusal to cooperate into evidence against him. Such is fundamentally flawed as a non-custodial defendant faces a similar dilemma of choosing to speak and potentially incriminate himself or remaining silent without facing contempt sanctions contemplated by the Fifth Amendment privilege. *Id.* Again, our decision today enforces one of the underlying policies of the Fifth Amendment, which is to avoid having a jury assume that a defendant's silence is equated with guilt.

The second part of the *Combs* analysis was the Court's review of whether the government's use of the pre-arrest silence in its case-in-chief was a legitimate govern-mental practice. *Combs*, 205 F.3d at 285–286. The Court noted that the government can only argue inferences from such silence; the probative value of such is minimal and far outweighed by the prejudice to the accused. *Id.* at 285. Whether silence comes before or after arrest, the consequence of such silence is ambiguous and cannot, on its own, determine whether a defendant is actually guilty. A defendant's pre-arrest silence may be based on a number of circumstances and not just the fact that he is guilty of the alleged crime.

> It may be desirable and dramatic for the wrongly accused person to shout: 'I am innocent!' but not everybody responds spontaneously to stimuli. The accusation may be so startling that the accused is benumbed into speechlessness. There are persons so sensitive and hurt so easily, that they swallow their tongue in the face of overwhelming injustice.

*Commonwealth v. Dravecz*, 424 Pa. 582, 587, 227 A.2d 904, 907 (1967).[19] Many may remain silent as they have a knowledge of their *Miranda* rights, others might remain silent to protect a third party or because

---

**19.** *Dravecz* disapproved the tacit admission rule in Pennsylvania as violative of the Fifth Amendment. We recognize that the facts of *Dravecz* are distinguishable as the case involved an arrested defendant's failure to respond to an accusatory statement read to him by the police. The case invalidated the premise that when a person remains silent in response to an incriminating statement, he is admitting the truth of that statement. The words of Justice Musmanno ring just as true today:

> The Superior Court, in affirming the conviction of the defendant, declared that it was bound by *Commonwealth v. Vallone*, 347 Pa. 419, 32 A.2d 889 [(1943)], which pronounced the proposition:
> 'The rule of evidence is well established that, when a statement made in the presence and hearing of a person is incriminating in character and naturally calls for a denial but is not challenged or contradicted by the accused although he has opportunity and liberty to speak, the statement and the fact of his failure to deny it are admissible in evidence as an implied admission of the truth of the charges thus made.'
> This rule, which hals [sic] become known as the tacit admission rule, is too broad, wide-sweeping, and elusive for precise interpretation, particularly where a man's liberty and his good name are at stake.
> . . . .
> And yet, under the *Vallone* holding, an accusatory statement made in any place chosen by the accuser, whether on the street, in the fields, in an alley or a dive, if unreplied to, may be used as an engine in court to send the defendant to prison or to the electric chair.
> *Id.* at 585–586, 227 A.2d at 906.

they fear the police. Some may remain silent as they fear their story will not be believed. *See Combs*, 205 F.3d at 285. It does not logically follow that because a person refuses to answer questions, he or she is hiding something. *Cf. United States v. Hale*, 422 U.S. 171, 176, 95 S.Ct. 2133, 45 L.Ed.2d 99 (1975) ("In most circumstances silence is so ambiguous that it is of little probative force."). Accordingly, the use of the defendant's silence does not significantly "advance[ ] the truth-finding function of the criminal trial." *Jenkins*, 447 U.S. at 238, 100 S.Ct. 2124.[20]

■ Turning back to the facts at hand, while not in the face of custodial interrogation, Molina refused to continue answering questions and cooperate with the investigation. Not having received the *Miranda* warnings at the time in question, the defendant had not yet become the beneficiary of the implicit assurances embodied within them. *See Fletcher*, 455 U.S. at 607, 102 S.Ct. 1309. The Commonwealth claims that the evidence was not compelled as an official investigation was not underway. The Commonwealth states that the investigators did not know if a crime had taken place at the time Molina refused to cooperate as Snodgrass was merely missing at this point. (Commonwealth's substituted brief at 28–30.) The Commonwealth suggests that because the police did not know whether a crime had been committed at the time Molina was questioned, the

import of his silence did not have constitutional implications. We disagree.

As Molina states, an investigation by a police officer was being conducted. During the investigation, the police developed information that Molina may have been involved in Snodgrass's disappearance. Furthermore, the prosecution's theory at closing was that Molina must have committed the murder before the police talked with him; otherwise he would not have refused to talk about a missing person. (*See* Molina's substituted brief at 39–40.) Lastly, Molina's Fifth Amendment right was not violated when he refused further questioning by Detective Hawthorne–Bey. Rather, his Fifth Amendment right was violated when the Commonwealth sought to use his silence against him at trial as substantive evidence of his guilt.

Thus, the trial court erred in overruling the objection to the Commonwealth's argument that Molina's refusal to talk to the police investigating his involvement in Snodgrass' disappearance was evidence of guilt.

### HARMLESS ERROR

■ This does not end our inquiry. In its substituted brief on appeal, the Commonwealth contends that the error should be deemed harmless. Thus, we must determine whether the improper reference to appellant's silence contributed to the verdict.

---

**20.** On the other hand, as the *Jenkins* Court detailed, the use of a defendant's pre-arrest silence for purposes of impeachment is much less intrusive upon an individual's Fifth Amendment rights as the defendant has already made the conscious choice of taking the stand. *See Jenkins*, 447 U.S. at 238, 100 S.Ct. 2124 ("impeachment follows the defendant's own decision to cast aside his cloak of silence"); *Lane*, 832 F.2d at 1017 (pointing out that impeachment is designed to detect perjury and that a defendant does not have a

constitutional right to perjure himself). As a result, the defendant is not forced to be a witness against himself, and the use of the silence is not to imply guilt. Further, it is the defendant who opens the door to impeachment evidence when he takes the stand and offers his version of events. Therefore, the defendant should not be able to object if the prosecution cross-examines him about the account he tells to the jury and such questioning furthers the truth-seeking process.

[A]n error will be deemed harmless where the appellate court is convinced beyond a reasonable doubt that the error could not have contributed to the verdict. Guidelines for determining whether an error is harmless include: (1) whether the error was prejudicial to the defendant or if prejudicial, whether the prejudice was *de minimis*; (2) whether the erroneously admitted evidence was merely cumulative of other, untainted evidence which was substantially similar to the erroneously admitted evidence; or (3) whether the evidence of guilt was so overwhelming as established by properly admitted and uncontradicted evidence that the prejudicial effect of the error was so insignificant by comparison to the verdict.

*Commonwealth v. Nolen*, 535 Pa. 77, 85, 634 A.2d 192, 196 (1993), citing *Commonwealth v. Story*, 476 Pa. 391, 410–415, 383 A.2d 155, 164–165 (1978) (footnote omitted). The burden of establishing that an error was harmless rests upon the Commonwealth. *Story*, 476 Pa. at 406 n. 11, 383 A.2d at 162 n. 11.

The trial court summarized the evidence at trial as follows:

On September 7, 2003, Melissa Snodgrass, (hereafter referred to as "Snodgrass"), was twenty-one years old, single and living with her mother and her pet dog, Baby, in the Northside Section of the City of Pittsburgh. On that day at approximately 11:00 a.m., she left her residence with her dog and told her mother she was off to do some errands. That was the last time any individual saw her alive. On March 9, 2004, her mummified remains were found in the basement of a house located at 1004 Spring Garden Avenue, by two individuals who had been hired to clean up that building.

. . . .

Snodgrass, who was unemployed and a drug user, supported herself by being a drug seller. One of her regular customers was [Michael] Benintend. Benintend worked odd jobs for the owner of the property located at 1004 Spring Garden Avenue, generally doing painting work for him. As a result of the money he earned on those construction jobs, Benintend usually purchased crack cocaine from Snodgrass two or three times a week. Benintend called Snodgrass early in the morning of September 7, 2003, and told her that he wanted to purchase two pieces of crack cocaine, a fifty dollar piece and a twenty dollar piece. . . .

At approximately 11:00 a.m., Snodgrass left her residence with her pet Chihuahua/terrier, named Baby, who was on a red leash, and told her mother that she had to do some errands. Snodgrass was dressed in the clothing in which she had slept the previous evening, which consisted of pajama bottoms and a blouse. Waiting at 1004 Spring Garden Avenue for Snodgrass were Benintend and Molina, who had instructed Benintend to call Snodgrass and tell her that he wanted to purchase some crack cocaine. Molina had driven to this address with Pam Deloe, another drug user. Molina hid his car so that someone walking down Spring Garden Avenue would not see that he was there. Benintend and Molina waited inside the house until Snodgrass arrived and Deloe waited outside. Snodgrass went into the house and was confronted by Molina who demanded to know where his money was from a previous heroin transaction that he had with Snodgrass. Snodgrass told Molina that she did not have the money but that she would get it. Molina became enraged and then struck Snodgrass in the face with a gun and

continued to savagely beat her with this gun and when she attempted to go out the front door, Benintend stepped in front of her so as to block her escape. Deloe, who was outside looking· in, screamed for Molina to stop but he continued until he had knocked Snodgrass into the ground and then he pulled out what appeared to be a sawed-off bat and continued to savagely beat her in and about the head area. Benintend then went to the back door and ran from the building away from Molina. Molina subsequently came out of the building and told Deloe to get in the car and later when she asked Molina what he had done with Snodgrass he told her, "nothing happened, you didn't see shit."

Benintend, after leaving the house, went to several bars in the Southside and proceeded to get drunk. He did not return to the Spring Garden Avenue residence until the next day and stayed there for approximately ten days, at which time, he left that residence since he had taken a job with a competitor of this former employer. In early January of 2004, Benintend decided to go to Florida because of the cold temperatures in the Pittsburgh area and the fact that he knew that there was an arrest warrant out for him since he failed to show up to meet with his probation officer because he knew that he would fail any of the drug tests that would have been given to him because of his repeated and continuous use of crack cocaine. Benintend went to Key West, Florida and lived in a homeless shelter while attempting to obtain employment in the construction industry.

On March 9, 2004, Snodgrass' mummified remains were found under a pile of garbage and debris located in the basement of 1004 Spring Garden Avenue. Next to Snodgrass was a red leash to which the mummified remains of her dog, Baby, were attached. Snodgrass was identified through dental records and a tattoo that she had on her body in addition to the clothing that she was wearing matching the description that her mother had given the police when she filed her missing person report the day after Snodgrass' disappearance. An autopsy was done on her remains and those remains showed extensive, advanced decomposition since all of her internal organs were gone; however, from a review of her skeletal remains, it was determined that she had multiple fractures of her skull which consisted of comminuted fractures of both orbits and the frontal plate and five fractures of her mandible. It was the opinion of Dr. Shawn Ladham, who performed the autopsy, that Snodgrass had died as a result of multiple blunt force trauma to her head. The investigation of the homicide scene revealed that Snodgrass' blood was on the rug in the living room where Deloe and Benintend had seen Molina striking Snodgrass and also on the walls of the hallway leading to the stairs of the basement and also on numerous steps of the basement stairs.

From the time of Snodgrass' disappearance on September 7, 2003, until her mummified remains were found on March 9, 2004, Snodgrass' disappearance was handled by the Missing Persons Unit of the Pittsburgh Police Department. Detective Stacey Hawthorne–Bey initially received information that Snodgrass might be being held against her will in Molina's house on Perrysville Avenue in the City of Pittsburgh. Detective Hawthorne–Bey went to that address to talk to Molina and was told that he was not present. She was told by Pamela Deloe that Snodgrass was not there. Detective Hawthorne–Bey

asked Deloe to tell Molina to call her and she gave Deloe her number. Later that day Molina did, in fact, call her and before she could ask him if he was aware that Snodgrass was missing, Molina told her that he did not know where she was but it was out on the street that he was somehow involved in her being missing and that was not true. When she asked him when was the last time that he had seen Snodgrass, he initially told her a year and a half earlier and then, moments later, said it was approximately three months earlier. Detective Hawthorne–Bey asked Molina to come down to the police headquarters so that she could further interview him and he refused.

After Benintend was arrested by the police in Key West, Florida, the Pittsburgh Police Homicide Unit was notified of Benintend's arrest and Detective Dennis Logan flew to Florida to interview Benintend. The initial interview took place on April 25, 2004, in an interview room in the police station in Key West and Benintend denied any knowledge with regard to Snodgrass and her disappearance. Detective Logan decided to conduct a second interview the next day to see if, in fact, he could obtain any information from Benintend. Benintend, while he was in jail in Florida, read a newspaper article which indicated that he was being charged with Snodgrass' murder and when he was interviewed on the second day by Detective Logan, he told Logan that Molina had instructed him to call Snodgrass and get her to come to 1004 Spring Garden Avenue. When she arrived and told Molina that she did not have the money that she owed Molina for drugs, that Molina became irate and then began to beat her in the head with a revolver and when he got her on the ground, he pulled a sawed-off baseball bat and continued to beat her. Benintend gave Logan a statement and after Logan had reduced it to writing and Benintend had reviewed that statement, he signed it. Benintend also agreed to be a witness against Molina when [his] case came to trial. Benintend had originally been charged with criminal homicide, unlawful restraint, aggravated assault and criminal conspiracy to commit criminal homicide. A plea agreement was reached with the District Attorney's Office, in exchange for his testimony, and Benintend plead guilty to aggravated assault, criminal conspiracy to commit aggravated assault and unlawful restraint. For his pleas of guilty Benintend was to receive a sentence of not less than five and one-half nor more than eleven years.

During the course of the missing person investigation and subsequent homicide investigation, the police learned that Pam Deloe was in a relationship with Molina and that she lived at this house on Perrysville Avenue with two other females and seven minors. Deloe indicated initially that she bought crack cocaine from Molina and that she moved in with him to have sexual relations with him in exchange for crack cocaine. Deloe acknowledged that when she was not with Molina, she engaged in business as a prostitute. On September 7, 2003, she rode with Molina to 1004 Spring Garden Avenue and watched Molina park the car approximately two blocks from that address so that it would not be seen. Molina went into the house where Benintend was and she stayed outside. A short time after they arrived, she saw Snodgrass walk down the street and go into the building. She then heard raised voices and she saw Molina striking Snodgrass in the head. When Snod-

grass attempted to run out of the residence Benintend blocked her escape. She yelled for Molina to stop but he only continued to strike Snodgrass' head. She ran back to the car and subsequently was joined by Molina.

In March of 2004, she and Molina had a fight which caused her to seek medical treatment at Allegheny General Hospital. She was given a prescription for medication and after she left the hospital and was walking down the street, Molina approached in a van, told her to get in and they, together with two other females known only by the names of Star and Jennifer, drove to Waterbury, Connecticut where they stayed in Molina's father house for approximately one month. On March 30, 2004, Lieutenant Scott Stephenson of the Waterbury, Connecticut Police received information from the Allegheny County Sheriff's Office that Deloe and Molina might be staying at Molina's father's home. Lieutenant Stephenson arrested Molina and brought Deloe to the police station so that he could interview her. Deloe gave him a detailed statement as to what she observed on September 7, 2003 at the Spring Garden residence.

Trial court opinion, 4/15/09 at 2–9.

■ The Commonwealth contends that the evidence of appellant's guilt is so overwhelming that the prosecutor's comments constituted harmless error. We do not agree. The record here precludes us from finding beyond a reasonable doubt that the prosecutor's improper reference to Molina's silence did not contribute to the jury's verdict.

In arguing that the evidence of guilt is overwhelming, the Commonwealth relies almost exclusively on the testimony of Deloe. While her testimony was sufficient evidence of guilt, it was anything but overwhelming. Deloe's credibility was sharply disputed. Reasonable jurors, faced with the inconsistencies pointed out by Molina, may very well have differed in assessing Deloe's credibility; thus her testimony cannot be relied upon as overwhelming evidence. *Cf. Commonwealth v. Lasch,* 464 Pa. 259, 346 A.2d 547 (1975) (testimony weakened by impeachment with prior inconsistent statements will not support a finding of harmlessness). The Commonwealth also points to Benintend's versions of events and claims that his testimony corroborates Deloe's. Benintend's credibility was also hotly contested. Our review of the testimony indicates that there are also inconsistencies in their version of events. For instance, Deloe testified that Troy Wade was present during the confrontation with Snodgrass while Benintend denied Troy Wade was present.

It is clear that the prosecutor deliberately exploited Molina's silence by asking the jury to infer guilt from the fact that he refused to go to the police station to be interviewed. The prejudice to Molina cannot be considered *de minimis.* The fact that the jury was persuaded to acquit Molina of the most serious charges while convicting him of others cannot rule out the possibility that the jury was not overwhelmed by the credibility of the testifying witnesses. Since this is a very plausible possibility and cannot be ruled out beyond a reasonable doubt, the error is not harmless.

As we cannot be sure that the jury would have resolved the issue in the same manner absent the improper reference to Molina's silence, we are not convinced beyond a reasonable doubt that the error did not contribute to the verdict. Far from being harmless error, the reference may well have impermissibly contributed to the verdict.

We reverse the convictions and vacate judgment of sentence. Case remanded. Jurisdiction relinquished.

President Judge STEVENS files a Dissenting Opinion which is joined by Judges BENDER, GANTMAN, and ALLEN.

DISSENTING OPINION BY STEVENS, P.J.:

I respectfully disagree with the learned Majority that the instant matter involves the use of pre-arrest silence which occurred in response to a request by law enforcement as substantive evidence of guilt and with its conclusion that the Commonwealth utilized Appellant's pre-arrest silence to support its contention that Appellant is guilty of Third Degree Murder and Unlawful Restraint. Instead, I would find that under the circumstances presented herein, Appellant did not have a protected constitutional interest in his decision to remain silent in the pre-arrest setting and that, even if he had, the Commonwealth's reference to his refusal to speak to police officers did not involve the use of pre-arrest silence as substantive evidence of guilt.

As the Majority notes, neither the United States Supreme Court nor the Pennsylvania Supreme Court has recognized a protected, constitutional interest in one's decision to remain silent in the pre-arrest, pre-*Miranda* setting and federal circuits and other state appellate courts are divided on this issue; however, neither of these Courts has recognized a protected, constitutional interest in the decision to remain silent in all of one's interactions with police. *Commonwealth v. DiNicola*, 581 Pa. 550, 565, 866 A.2d 329, 338 (2005) (Castille, J. concurring). I would find that the privilege against self-incrimination is irrelevant to a citizen's decision to remain silent when he or she is under no official compulsion to speak.

Herein, Detective Hawthorne–Bey, a member of the Missing Persons Unit of the Pittsburgh Police in 2003, testified she received information that led her to attempt to contact Appellant regarding Ms. Snodgrass's disappearance. N.T., 12/18/0–12/20/06 Vol. II at 477–479. Though she wanted to speak with Appellant regarding Ms. Snodgrass's whereabouts, he was not at the address where she believed he may be located. She asked the individual present at the residence to have Appellant contact her. When Appellant telephoned Detective Hawthorne–Bey later that day, he was neither a suspect nor under any coercion to speak when he *sua sponte* informed her he did not know where Ms. Snodgrass was, for, indeed, Detective Hawthorne–Bey had not yet even begun to investigate a crime as she was merely attempting to ascertain Ms. Snodgrass's whereabouts. *Id.* at 479–480. Since under these circumstances I would conclude that Appellant had no right against self-incrimination, it follows that Appellant cannot argue that he is entitled to constitutional protection.

Even if I were to agree with the Majority's determination "that the Commonwealth cannot use a non-testifying defendant's pre-arrest silence to support its contention that the defendant is guilty of the crime charged as such use infringes on a defendant's right to be free from self-incrimination" and that Appellant may assert the privilege, I believe the prosecution's statements during closing argument did not constitute the use of pre-arrest silence as substantive evidence of guilt.

Our Supreme Court provided in *Commonwealth v. Whitney*, 550 Pa. 618, 633, 708 A.2d 471, 478 (1998) that: "[e]ven an explicit reference to silence is not reversible error where it occurs in a context not

likely to suggest to the jury that silence is the equivalent of a tacit admission of guilt." (citation omitted). During its closing, the prosecution noted Appellant refused to cooperate with the Missing Persons detectives and questioned "And why?." Following an objection and sidebar discussion, the Commonwealth added: "Factor that in when you're making an important decision in this case as well." N.T. 12/18/06–12/20/06 Vol. II at 579–581. The prosecution provided no additional commentary on this point, and nowhere did it specifically invite the jury to infer guilt from Appellant's silence. The prosecution merely asked the jury to remember testimony Appellant had not objected to earlier that Appellant stated to Detective Hawthorne–Bey he would not cooperate with the police. The Commonwealth properly could recall for the jury Detective Hawthorne–Bey's earlier testimony and comment fairly upon it. *See Commonwealth v. Ogrod*, 576 Pa. 412, 493, 839 A.2d 294, 342 (2003) (finding the Commonwealth's statement that "if he doesn't like the life in prison, then maybe he shouldn't have committed the crime. If he doesn't like life in prison, well, we can take care of that and he won't have to do it" which was made response to the appellant's argument that life in prison would be "hell" for him fell within the "reasonable latitude" that is accorded prosecutors in making their closing arguments and clearly did not have an unavoidable effect of prejudicing the jury or preventing it from properly weighing the evidence and rendering a true verdict).

Similarly, in a case where a panel of this Court determined the prosecution had "tried to cover a weak case with strong rhetoric" and after noting that "[w]here the evidence of guilt is far from overwhelming, we should be especially hesitant to brush off a starkly improper closing speech as harmless," and that "the offending remarks were of sufficient potency to have affected the outcome of trial," this Court found any prejudicial effect of the "inflammatory and improper" remarks had been cured when the trial court instructed the jury that counsel's closing arguments were not evidence. *Commonwealth v. Thompson*, 442 Pa.Super. 447, 660 A.2d 68, 75–76 (1995), *appeal denied*, 544 Pa. 629, 675 A.2d 1247 (1996). Furthermore, our Supreme Court has held that a jury is presumed to have followed the trial court's instruction so that a new trial is not required to remedy every improper remark the prosecution may make. "Only where the unavoidable effect of the remark creates such a bias and hostility that the jury could not render a true verdict will reversal be mandated." *Commonwealth v. Baker*, 531 Pa. 541, 558, 614 A.2d 663, 672 (1992).

Herein, in its closing argument, the Commonwealth informed the jury that statements made by counsel are not evidence. N.T., 12/18/06–12/20/06 Vol. II at 561–62, 575. The trial court further instructed the jury that Appellant was presumed to be innocent and that it must render its verdict after considering only the evidence that had been presented, or lack thereof, during trial. *Id.* at 586–587. Importantly, the trial court also stressed to the jury that while it should carefully consider the arguments of counsel when analyzing the facts of the case, counsel's arguments do not constitute evidence and that the only evidence that it "will consider is the testimony of the witnesses who have come forward and the exhibits that will be given to you." *Id.* at 605–606. The trial court also explained that Appellant's exercise of his right not to testify at trial and to remain silent was "founded upon the constitutions of the United States and the Commonwealth of Pennsylvania" and that "[t]he mere fact that he did not testify can be considered by you, and you may not

 

infer guilt from that decision, nor may you draw any inference adverse to him as a result of his decision not to testify." *Id.* at 595.

As I would find no error in the trial court's decision to overrule Appellant's objection during the prosecution's closing argument, I would not reach the question of whether the error had been harmless.[21]

---

**21.** I note that were I to do so, I would find that any error the prosecution made during closing arguments was harmless in light of the evidence it had presented against Appellant throughout trial. Thus, I would find any prejudice was *de minimis.* *See Commonwealth v. Nolen,* 535 Pa. 77, 85, 634 A.2d 192, 196 (1993).

