## COMMONWEALTH of Pennsylvania

v.

## William T. REED, Appellant.

Superior Court of Pennsylvania.

Submitted Sept. 26, 2011.

Filed Feb. 27, 2012.

**316**

Stanton M. Lacks, Bensalem, for appellant.

David W. Heckler, Assistant District Attorney, Doylestown, for Commonwealth, appellee.

BEFORE: FORD ELLIOTT, P.J.E., BENDER and BOWES, JJ.

OPINION PER CURIAM:

William T. Reed appeals the order of October 14, 2010, denying his PCRA[1] petition. We affirm.

On August 31, 2007, following a jury trial, appellant was found guilty of rape of a child, involuntary deviate sexual intercourse ("IDSI"), aggravated indecent assault, indecent assault, unlawful contact with a minor, and corruption of minors. The charges were brought in connection with appellant's sexual abuse of his girlfriend's 8–year–old daughter, M.M. On December 10, 2007, appellant received an aggregate sentence of 10 to 20 years' in-

carceration. No post-sentence motions were filed; however, on January 3, 2008, appellant filed a timely notice of appeal. On June 19, 2009, this court affirmed the judgment of sentence. *Commonwealth v. Reed*, 981 A.2d 320 (Pa.Super.2009) (unpublished memorandum). Appellant did not file a petition for allowance of appeal with the Pennsylvania Supreme Court.

On June 11, 2010, appellant filed a timely, counseled PCRA petition raising various claims of trial counsel ineffectiveness. An evidentiary hearing was held on October 13, 2010, at which trial counsel, William Craig Penglase, Esq., testified. On October 14, 2010, appellant's PCRA petition was denied. A timely notice of appeal was filed on November 10, 2010. Appellant complied with Pa.R.A.P., Rule 1925(b), 42 Pa.C.S.A., and the PCRA court has filed an opinion.

Before proceeding to appellant's ineffectiveness claims on appeal from denial of PCRA relief, we recount the testimony presented at trial, as aptly summarized by the PCRA court:

During the trial in August 2007, the Commonwealth presented the testimony of M.M., her brother, W.M., Kim DeGroff, an agent of the Bucks County Children and Youth Social Services Agency, and Detective Kyle Sheluga, a detective in Bensalem Township.

M.M.[Footnote 8] testified that she knew Defendant as "B" and that he was her mother's boyfriend. At the time of the incident, she was in second grade and living temporarily in the hotel room with her siblings, mother, and "B." She testified that Defendant watched her and her siblings while her mother was at work and she described the layout of the room, which included a blanket strung between two beds that divided the room

1. Post–Conviction Relief Act, 42 Pa.C.S.A. §§ 9541–9546.

into an adult side and a child side. M.M. and her siblings often complained about the "sounds" made by their mother and Defendant while they were in bed together on the adult side of the room. (N.T. 37–31, 8/29/07.)

M.M. testified that on the night of the incident she was watching television with her brother, W.M. When W.M. entered the bathroom to shower, Defendant asked M.M. to come over to his bed where he penetrated M.M. anally with his penis, forced his penis into her mouth (which allowed M.M. to physically describe his genitals to the jury), and digitally penetrated her vagina. Soon after the assault, M.M. told W.M. and her sister who urged her to tell their mother. M.M. also testified that shortly after the rape she went to the bathroom where she noticed she was bleeding. She was able to tell the jury which parts of Defendant's body touched her, and she used a series of anatomical diagrams to explicate her testimony. (N.T. 31–39, 8/29/07.)

After [Mother] returned home, Defendant left the room and M.M. told her mother about Defendant's assault. She testified that her mom began to cry and said she would have to "get rid of [M.M.]." Although [Mother] changed her mind and decided Defendant would have to leave, M.M. testified that he nonetheless continued to live with them. Despite M.M.'s account, which was corroborated by W.M., and her own training as a nurse, [Mother] did not physically inspect M.M. or take her to a hospital for an examination. (N.T. 34, 41–43, 8/29/07.)

Next, Ms. DeGroff testified that on January 16, 2007, she was assigned to M.M.'s case in response to a confidential referral. In addition to reciting M.M.'s version of the incident during the trial, Ms. DeGroff testified that, on January 16, 2007, she, accompanied by Detective Sheluga and his partner, met with M.M. at her school. Ms. DeGroff asked M.M. if she knew why Ms. DeGroff was there, and M.M. replied that it was because of "B." Following the interview, Ms. DeGroff and the detectives went to M.M.'s apartment where she resided with her mother, siblings, and Defendant. Ms. DeGroff told [Mother] and Defendant that she had concerns about M.M.'s safety and requested Defendant have no contact with the children. (N.T. 79–81, 8/29/07.)

Detective Sheluga also testified about the January 16, 2007 meeting and subsequent trip to M.M.'s home. After Defendant was informed he needed to leave the apartment and have no contact with the children, he left to go to work without argument. Defendant, however, took his apartment key, and, at the request of [Mother], Detective Sheluga and his partner went to Defendant's workplace, a Holiday Inn, to retrieve the key. Defendant met with the detectives in the lobby, relinquished the key, and asked what was going on. Detective Sheluga explained there were allegations of abuse against Defendant who initially believed [Mother] had made the allegations. Detective Sheluga further testified that, upon learning that M.M. made the allegations, Defendant indicated he knew what incident M.M. was referring to and explained that, in November 2006, he had been watching [Mother]'s children and had fallen asleep on the adult side of the room while drinking. Defendant awoke to find M.M., clothed in only her underpants, "coming on to him." Detective Sheluga testified that Defendant stated he felt violated and told M.M. to stop, and, due to his tight-fitting boxers, he did not believe M.M.

had seen or touched his penis, which was not erect. (N.T. 19–25, 8/30/07.)

During trial, Ms. DeGroff further testified that she conducted a second interview with M.M. on February 6, 2007. Ms. DeGroff testified that, during the interview, M.M. stated that she would hear her mother and Defendant having intercourse or "doing what adults do when they like each other." M.M. also stated that when she told her mother about the assault, her mother told M.M. that "she would never do what adults do that like each other with him ever again." During this interview, Ms. DeGroff ultimately determined that M.M. should not return to the apartment. (N.T. 93, 8/29/[07].)

Detective Sheluga testified that after the second interview on February 6, 2007, he went to [Mother]'s apartment to provide her with forms advising that M.M. would not return to the home. Defendant was present at the apartment and requested to speak privately with Detective Sheluga. Detective Sheluga testified that Defendant stated he was aware that he was not permitted to be at the apartment but that he came over when the children were not present. Defendant further stated that he was aware of M.M.'s accusation and that M.M. was likely thinking back to a prior sexual assault which involved M.M.'s half-brother. (N.T. 28, 8/30/2007.) Detective Sheluga asked Defendant to speak with him again and Defendant agreed to meet with Detective Sheluga the next day. No meeting occurred, however; when Detective Sheluga called Defendant, Defendant stated that he wanted counsel:

Q: On February 7th did Mr. Reed meet with you?

A: No, he didn't.

Q: Did you receive a telephone call from him?

A: I had called him to confirm or to set up a time for our meeting that day.

Q: What did he say to you?

A[:] At that time he told me that he had spoken—or he didn't want to speak to me at that time because he wanted to talk to an attorney.

Q: At that point did you—what did you tell him to do at that point?

A: I told him once he speaks to his attorney to have his attorney contact me.

Q: And is that the normal procedure when a defendant indicates they want an attorney?

A: Yes. Once they want an attorney, they invoke their right for an attorney, I can't ask them anymore questions, but I do ask them to have their attorney contact me so that if we have some further incidents or questioning we can try to work something out or arrange something.

(N.T. 29–30, 8/30/2007.)

Detective Sheluga next testified that on April 12, 2007, after he had attempted unsuccessfully to arrest Defendant, Defendant called Detective Sheluga and stated that he had moved to Virginia and would not return because "he didn't do anything." Defendant stated that he knew M.M. had gone to the hospital for examination and that "nothing was tampered with down there." Defendant also said that M.M. had a crush on him and was jealous because of his relationship with her mother. (N.T. 34–35, 8/30/2007.) During trial, Detective Sheluga also recited M.M.'s version of the assault based on his interview with her. (N.T. 15–16, 8/30/2007.)

Defendant offered one witness, [Mother], who testified that she and Defendant were presently engaged to be married. She testified that when M.M. told her about the rape, she questioned and examined M.M., including her vagina and anus, without finding any signs of abuse. [Mother] noted a concern that M.M. was having nightmares about a prior sexual assault perpetrated by M.M.'s half-brother. She then testified that she did not call the police or take M.M. for further examination because she did not believe anything inappropriate had occurred. (N.T. 134, 139–144, 8/30/2007.)

[Footnote 8] After the selection of a jury, the Commonwealth established M.M.'s competency as a witness. (N.T. 21–25, 8/29/07.) At Defendant's request, we explained competency and what it meant to find M.M. as a competent witness to the jury. (N.T. 25–26, 8/29/07.) We noted, specifically, that we were not passing judgment on M.M.'s credibility, and that they, the jury, were the sole judges of a witness's [ ] credibility. (N.T. 25–26, 8/29/2007.)

PCRA court opinion, 2/16/11 at 2–6.

Appellant brings two claims of trial counsel ineffectiveness. In his first issue on appeal, appellant claims that trial counsel was ineffective for failing to object and seek a mistrial when Detective Sheluga allegedly made an improper reference to appellant's invocation of his Fifth Amendment right to remain silent.

 Initially, we recite our standard of review:

This Court's standard of review regarding an order denying a petition under the PCRA is whether the determination of the PCRA court is supported by the evidence of record and is free of legal error. *Commonwealth v. Halley,* 582 Pa. 164, 870 A.2d 795, 799 n. 2 (2005).

The PCRA court's findings will not be disturbed unless there is no support for the findings in the certified record. *Commonwealth v. Carr,* 768 A.2d 1164, 1166 (Pa.Super.2001).

*Commonwealth v. Turetsky,* 925 A.2d 876, 879 (Pa.Super.2007), *appeal denied,* 596 Pa. 707, 940 A.2d 365 (2007).

"To prevail on a claim alleging counsel's ineffectiveness, Appellant must demonstrate (1) that the underlying claim is of arguable merit; (2) that counsel's course of conduct was without a reasonable basis designed to effectuate his client's interest; and (3) that he was prejudiced by counsel's ineffectiveness." *Commonwealth v. Wallace,* 555 Pa. 397, 407, 724 A.2d 916, 921 (1999), citing *Commonwealth v. Howard,* 538 Pa. 86, 93, 645 A.2d 1300, 1304 (1994) (other citation omitted). In order to meet the prejudice prong of the ineffectiveness standard, a defendant must show that there is a " 'reasonable probability that but for counsel's unprofessional errors, the result of the proceeding would have been different.' " *Commonwealth v. Kimball,* 555 Pa. 299, 308, 724 A.2d 326, 331 (1999), quoting *Strickland v. Washington,* 466 U.S. 668, 694, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). A " '[r]easonable probability' is defined as 'a probability sufficient to undermine confidence in the outcome.' " *Id.* at 309, 724 A.2d at 331, quoting *Strickland,* 466 U.S. at 694, 104 S.Ct. 2052.

*Commonwealth v. Jones,* 811 A.2d 1057, 1060 (Pa.Super.2002), *appeal denied,* 574 Pa. 765, 832 A.2d 435 (2003).

Detective Sheluga testified that he spoke with appellant about the incident on January 16 and February 6, 2007. Appellant was not under arrest at this time and spoke with the detective freely. On February 6, 2007, Detective Sheluga asked

appellant if he would be willing to speak with him again concerning M.M.'s allegations. (Notes of testimony, 8/30/07 at 29.) Appellant indicated that he would speak with him the following day, February 7, 2007. (*Id.*)

As stated above in the PCRA court's recitation of the facts, on February 7, 2007, Detective Sheluga called appellant to set up a time for their meeting that day. (*Id.* at 30.) Appellant indicated to Detective Sheluga that "he didn't want to speak to me at that time because he wanted to talk to an attorney." (*Id.*) Detective Sheluga testified that at that point, "I told him once he speaks to his attorney to have his attorney contact me." (*Id.*) Detective Sheluga testified,

> Once they want an attorney, they invoke their right for an attorney, I don't ask them anymore questions, but I do ask them to have their attorney contact me so that if we have some further incidents or questioning we can try to work something out or arrange something.

*Id.*

According to Attorney Penglase, appellant did not invoke his right to remain silent; rather, appellant invoked his Sixth Amendment right to counsel. Attorney Penglase explained at the PCRA hearing:

> [T]he right that [appellant] was invoking on pages 29 and 30 was not his Fifth Amendment right to remain silent, it was his Sixth Amendment right to counsel. In other words, Mr.—as it was described by Detective Sheluga, [appellant] didn't say "I'm not talking to you because I want to remain silent pursuant to my Fifth Amendment protection," what he was saying was "I'm done talking to you until I seek the advice of counsel," which, based on my understanding of the law, is not reason for a mistrial. It's not even reason for an objection. This is simply an explanation

by the witness, who at the time was Detective Sheluga, saying I had been talking with [appellant], we had been engaged in phone conversations, and at some point he said he didn't want to talk to me anymore and he wanted to seek the help of a lawyer, which the jury clearly knew he had done since I was sitting next to him at trial counsel table.

Notes of testimony, 10/13/10 at 34–35.

■■■ At the time Detective Sheluga called appellant to confirm a time for a meeting, appellant was not under arrest or formally charged with the crimes at issue. Appellant informed the detective that he did not wish to speak to the officer, but desired to seek advice from an attorney. This is not invocation of the Sixth Amendment right to counsel. As our supreme court has plainly recognized, "in criminal cases the Sixth Amendment right to counsel attaches only at or after the initiation of adversarial judicial proceedings against an accused, and not before." *Commonwealth v. Colavita*, 606 Pa. 1, 23, 993 A.2d 874, 888 (2010). The *Colavita* court further explained:

> The Sixth Amendment speaks of a right to the assistance of counsel in "criminal prosecutions" and that right to counsel is one of the specific incorporated rights. *See Gideon v. Wainwright*, 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963). But the right as incorporated is not without temporal limits. The right to counsel attaches at a particular point in time which reflects its "criminal prosecution" roots: "[A] criminal defendant's initial appearance before a judicial officer, where he learns the charge against him and his liberty is subject to restriction, marks the start of adversary judicial proceedings that trigger attachment of the Sixth Amendment right to counsel." *Commonwealth v. McCoy*, 601 Pa. 540, 975 A.2d 586, 590 (2009) (quoting

*Rothgery v. Gillespie County, Tex.,* 554 U.S. 191, 191, 128 S.Ct. 2578, 2592, 171 L.Ed.2d 366 (2008)).

*Id.* at 27–28, 993 A.2d at 890–891. Instantly, no adversarial judicial proceeding had begun. Thus, there is no Sixth Amendment issue involved in the present matter and counsel at the PCRA hearing was legally incorrect in believing that appellant invoked his Sixth Amendment right to counsel. *Commonwealth v. Hayes,* 755 A.2d 27, 31–33 (Pa.Super.2000) (distinguishing between Fifth and Sixth Amendment right to counsel).[2]

 However, "In addition to the Sixth Amendment right to counsel, the United States Supreme Court has held that a separate right to counsel is encompassed in the Fifth Amendment guarantee that '[n]o person . . . shall be compelled in any criminal case to be a witness against himself.'" *Colavita,* 606 Pa. at 19, 993 A.2d at 885 (bracket in original) (internal citation omitted). Typically, "[t]o invoke the right to counsel, 'at a minimum, some statement that can reasonably be construed to be an expression of a desire for the assistance of an attorney in dealing with custodial interrogation by police' is required." *Commonwealth v. Fears,* 575 Pa. 281, 296, 836 A.2d 52, 61 (2003), quoting *Commonwealth v. Hayes,* 755 A.2d 27,

33 (Pa.Super.2000), quoting *McNeil v. Wisconsin,* 501 U.S. 171, 178, 111 S.Ct. 2204, 115 L.Ed.2d 158 (1991). Here, although appellant was not in a custodial setting, he was a suspect in a criminal investigation, and he asked to speak with an attorney before discussing the matter further with police. The officer declined to inquire further and requested appellant have his attorney contact him. Thus, there was no violation of the Fifth Amendment right to counsel since appellant was not in custody nor did the officer question him.[3]

We recently granted *en banc* review in the case of *Commonwealth v. Molina,* 33 A.3d 51 (Pa.Super.2011) (*en banc*), to decide whether the Commonwealth can use a non-testifying defendant's pre-arrest silence to support its contention that the defendant is guilty of the crime charged or whether such use impermissibly infringes upon a defendant's right to be free from self-incrimination. In *Molina,* decided November 9, 2011, we held that the government may not use a non-testifying defendant's silence during the investigation of a crime as substantive evidence of guilt, finding that it is "of no moment whether the silence occurred before or after the arrest or before or after *Miranda* warn-

---

**2.** Both the Sixth Amendment right to counsel and its Pennsylvania counterpart have been held to attach at the same time and are generally considered coterminous. *Commonwealth v. Gwynn,* 596 Pa. 398, 410, 943 A.2d 940, 947–948 (2008). Ordinarily, this right to counsel attaches at arraignment. *Id.* at 410, 943 A.2d at 948; *but see Commonwealth v. Karash,* 513 Pa. 6, 13–14, 518 A.2d 537, 541 (1986) (discussing that in Pennsylvania the Sixth Amendment right to counsel attaches after arrest); *Commonwealth v. Richman,* 458 Pa. 167, 320 A.2d 351 (1974) (same); *Commonwealth v. Whiting,* 439 Pa. 205, 266 A.2d 738 (1970) (right to counsel infringed where post-arrest but pre-charge photographic line-up was conducted without counsel present).

**3.** There is case law broadly holding that the Fifth Amendment right to counsel and the right to remain silent do not attach until one is in a custodial setting. *See Commonwealth v. Jones,* 758 A.2d 228 (Pa.Super.2000); *Commonwealth v. Ellis,* 700 A.2d 948 (Pa.Super.1997). In light of our recent *en banc* opinion in *Commonwealth v. Molina,* 33 A.3d 51 (Pa.Super.2011) (*en banc*), these statements probably go too far. A person does have a right to remain silent, though not entitled to *Miranda* warnings, outside of a custodial setting, and reference to that silence to infer guilt is impermissible.

ings were administered." *Id.* at 63.[4]

In *Molina,* the defendant declined to come in for an interview with a detective investigating a missing person. At the time the detective made inquiry with him, Molina was not in custody nor was the officer even investigating a crime. During closing statements, the prosecutor asked the jury to consider Molina's refusal to interview with police during their deliberations. The trial court denied a request for an instruction that Molina's silence could not be used to infer guilt. According to the Commonwealth, because Molina was not being investigated for the commission of a crime at the time of his refusal to be interviewed by police, his silence could be used as a tacit admission of guilt. In essence, the Commonwealth's position was that if the police question an individual while not in custody, he must answer or his silence can be used to infer guilt when he does not testify. This court, after thoroughly analyzing the differing views in various state and federal courts, held that the prosecution impermissibly infringed on Molina's right to remain silent by urging the jury to consider his silence during deliberations.

■ Instantly, unlike *Molina,* appellant does not posit that the Commonwealth argued or referenced appellant's request for an attorney as evidence of guilt. Further, there is no dispute that the right to remain

silent is not so broad as to prevent all references to silence in every case involving interaction with police. *Commonwealth v. DiNicola,* 581 Pa. 550, 565 n. 2, 866 A.2d 329, 338 n. 2 (2005) (Castille, J. concurring). Indeed, in *Molina* there was no contention that there existed a yet-to-be recognized constitutional right to remain silent in all interaction with police, which would bar any references to silence. *See Jenkins v. Anderson,* 447 U.S. 231, 100 S.Ct. 2124, 65 L.Ed.2d 86 (1980) (prosecution may use pre-arrest silence to impeach a testifying defendant's testimony); *DiNicola, supra* (pre-arrest silence permissible in fair response to a testifying defendant's defense that police did not investigate thoroughly); *Commonwealth v. Monahan,* 378 Pa.Super. 623, 549 A.2d 231 (1988). Rather, the constitutional right being argued in *Molina* was more circumscribed, *i.e.,* the right against self-incrimination at trial prohibited prosecutorial argument that a non-testifying defendant's pre-arrest silence is substantive evidence of guilt.[5]

Our supreme court addressed a similar issue to the one herein in *DiNicola, supra. DiNicola* involved aggravated indecent assault and related charges. The investigating state trooper contacted the defendant to ask for an interview. The defendant declined and stated that he

---

**4.** We find the Commonwealth's contention that appellant did not indicate he wished to remain silent legally erroneous. In the post-*Miranda* warnings setting, "silence does not mean only muteness; it includes the statement of a desire to remain silent as well as of a desire to remain silent until an attorney has been consulted." *Wainwright v. Greenfield,* 474 U.S. 284, 295 n. 13, 106 S.Ct. 634, 88 L.Ed.2d 623 (1986). A criminal suspect's pre-*Miranda* request to discuss a matter with an attorney can, in certain instances, implicate the right to remain silent as well. To blanketly hold otherwise would create a Hobson's choice in which suspects in a non-custo-

dial setting must either speak to police or risk the use of their request to discuss matters with an attorney as substantive evidence of guilt.

**5.** In *Commonwealth v. Bolus,* 545 Pa. 103, 113 n. 5, 680 A.2d 839, 844 n. 5 (1996), our supreme court stated, "We leave for another day the question of whether a prosecutor may introduce evidence of a criminal defendant's pre-arrest silence when the defendant exercises his constitutional right to remain silent and does not testify at his own trial."

would need to contact an attorney. His attorney later informed police that the defendant denied any inappropriate contact and on the advice of counsel would assert his right to remain silent at any police interview. At trial, defense counsel directly questioned the trooper's investigation by placing the officer on the stand. The prosecution objected to the questioning, noting that it could lead the officer to discuss the defendant's pre-arrest silence. On cross-examination by the prosecutor, the officer testified that the defendant declined to be interviewed and that counsel contacted him to tell him that the defendant denied the allegations and would assert his right to remain silent at any police interview.

Sitting *en banc*, this court held that the Commonwealth could only reference pre-arrest silence to impeach the defendant and not to show whether police conducted a proper investigation. Our supreme court reversed, holding that the Fifth Amendment does not preclude a prosecutor from fairly responding to defense argument by referencing a testifying defendant's prior silence.

■ Unlike *DiNicola*, appellant did not testify herein, nor did defense counsel attempt to argue that the police investigation was shoddy, thereby opening the door to a fair response. In authoring a concurring opinion in *DiNicola*, Justice Saylor urged proper consideration of "the long line of this Court's decisions recognizing the potential impact that disclosure of a criminal defendant's silence or assertion of privilege in the face of accusation or questioning may have upon a jury determination of guilt versus innocence." *Id.* at 573, 866 A.2d at 343 (Saylor, J. concurring). In that same case, Justice Newman penned a concurring and dissenting opinion in which she reasoned that, "Appellee's constitutional right to remain silent may well have

been implicated and he may have suffered prejudice as a result of the evidence concerning his pre-arrest silence." *Id.* at 584, 866 A.2d at 350 (Newman, J. concurring and dissenting). Thus, appellant has presented a position with some arguable merit. Furthermore, as delineated above, counsel's explanation that he did not object because he believed appellant invoked his Sixth Amendment right to counsel was legally erroneous and therefore unreasonable.

■ Nonetheless, we conclude that appellant cannot establish actual prejudice, *i.e.*, that there is a reasonable probability that the outcome of his trial would have differed had counsel objected. Here the reference to appellant's statement regarding wanting to speak to an attorney "was not used in any fashion that was likely to burden [appellant's] Fifth Amendment right or to create an inference of an admission of guilt." *DiNicola*, *supra* at 563, 866 A.2d at 337. In his concurring opinion in *DiNicola*, Justice, now Chief Justice, Castille highlighted that the Commonwealth "did not argue that the trooper's testimony and appellee's decision to decline the trooper's interview request should be deemed a tacit admission of guilt to an accusation the trooper had yet to make." *Id.* at 565, 866 A.2d at 338. He continued, "The prosecutor never argued to the jury that appellee's response to the request for an interview tacitly suggested his guilt[.]" *Id.* Finally, Justice Castille stated, "nothing in the introduction or use of the disputed evidence in this case triggers the constitutional concerns which have led to the prohibition of those references to pre-trial silence which impermissibly burden the exercise of one's constitutional right to remain silent." *Id.*

A similar analysis applies to the case *sub judice*. Appellant has not provided the closing arguments of the prosecution or

asserted that the prosecutor urged the jury to infer guilt based on the passing testimony related to appellant's reference to his desire to speak with an attorney. Further, appellant spoke with police both before and after he declined to be interviewed and denied the allegations. In addition, the detective's testimony did not reveal that appellant tacitly admitted guilt, but instead disclosed the steps the police took to investigate the sexual allegations. As in *Molina*, "The revelation of silence in this case was limited to its context." *Molina, supra* at 56. Instantly, the detective related the exchange with appellant, who had denied wrongdoing both before and after he had requested an opportunity to speak with a lawyer. *See id.* Since there is no indication by appellant that the Commonwealth sought to use his pre-arrest desire to remain silent until he consulted a lawyer as substantive evidence of guilt, appellant's ineffectiveness claim in this regard does not afford relief.

■ In his second and final issue for appeal, appellant claims that trial counsel was ineffective for allowing Detective Sheluga and Ms. DeGroff to testify regarding prior out-of-court statements by the victim, M.M. According to appellant, these statements constituted impermissible hearsay and trial counsel was ineffective for not moving to exclude them.

In *Commonwealth ex rel. Washington v. Maroney*, [427] Pa. [599], 235 A.2d 349 (1967), [*overruled on other grounds by Commonwealth v. Pierce*, 515 Pa. 153, 527 A.2d 973 (1987),] we held that before a claim of ineffectiveness can be sustained, it must be determined that, in light of all the alternatives available to counsel, the strategy Actually employed was so unreasonable that no competent lawyer would have chosen it.

*Commonwealth v. Hill*, 427 Pa. 614, 616–617, 235 A.2d 347, 349 (1967). "If a reasonable basis exists for the particular course, the inquiry ends and counsel's performance is deemed constitutionally effective." *Commonwealth v. Abdul-Salaam*, 570 Pa. 79, 84, 808 A.2d 558, 561 (2001), citing *Commonwealth v. Derk*, 553 Pa. 325, 333, 719 A.2d 262, 266 (1998) (opinion in support of affirmance).

Nor can a claim of ineffective assistance generally succeed through comparing, by hindsight, the trial strategy employed with alternatives not pursued. A finding that a chosen strategy lacked a reasonable basis is not warranted unless it can be concluded that an alternative not chosen offered a potential for success substantially greater than the course actually pursued.

*Commonwealth v. Miller*, 572 Pa. 623, 646, 819 A.2d 504, 517 (2002), *cert. denied*, 540 U.S. 827, 124 S.Ct. 50, 157 L.Ed.2d 50 (2003) (citation omitted).

Instantly, Attorney Penglase had an apparently reasonable basis for not moving to exclude the victim's prior statements to Ms. DeGroff and Detective Sheluga:

The whole purpose of my cross-examination of the eight-year-old child was to show that her statement in court during trial was inconsistent with the statement that she had given both to Detective Sheluga and to the social worker. I had to have the testimony of both the social worker and Detective Sheluga in order to argue the claim that the child was not credible, because her story had changed over time.

Notes of testimony, 10/13/10 at 21. "So, I knew internally her story was not one hundred percent consistent, as frankly one would suspect from an eight-year-old child, but I wanted to demonstrate that for the jury." (*Id.* at 22.)

Appellant argues that in the end, the strategy did not succeed because the vic-

tim's trial testimony remained substantially consistent with her prior out-of-court statements on the main points. Appellant argues that allowing Ms. DeGroff and Detective Sheluga to testify regarding the victim's prior statements had the undesirable effect of bolstering her credibility. Attorney Penglase conceded that the strategy was not entirely successful:

> I mean she didn't come in and say it was somebody else or that it didn't happen, she came in with a conglomeration of what she said previously, and, frankly, I think the cross-examination was fairly effective. I think that she got a lot of things wrong, like an eight-year-old might get wrong, but she came back to some core issues that I couldn't get her to say were wrong. And I think that is ultimately what rendered the verdict in this case, that I couldn't shake her off a couple of key ideas even though much of the other things she said were inconsistent.

*Id.* at 64.

As in many child sexual abuse cases, this matter came down to credibility, *i.e.,* whether or not the jury believed the victim's version of events. Trial counsel's chosen strategy of attempting to destroy the victim's credibility by highlighting various inconsistencies between and among her prior statements to Ms. DeGroff and Detective Sheluga, and her trial testimony, was a sound one. Whether or not the strategy resulted in an acquittal is not the issue. As the PCRA court states, appellant has failed to show that counsel had an alternative strategy available with a greater likelihood of success. (PCRA court opinion, 2/16/11 at 11.) Attorney Penglase, an experienced litigator, had a reasonable basis for choosing not to object to the admission into evidence of the victim's prior out-of-court statements and cannot be held ineffective in this regard. The PCRA court did not err in denying relief on this basis.

Order affirmed.