J-S37027-16

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | |
| v. | |
| LUZAY WATSON, | |
| Appellant | No. 1218 WDA 2015 |

Appeal from the PCRA Order July 9, 2015
In the Court of Common Pleas of Allegheny County
Criminal Division at No(s): CP-02-CR-0011093-2009

BEFORE: GANTMAN, P.J., SHOGAN and LAZARUS, JJ.

MEMORANDUM BY SHOGAN, J.: **FILED AUGUST 11, 2016**

Appellant, Luzay Watson, appeals from the order denying his petition for collateral relief filed pursuant to the Post Conviction Relief Act ("PCRA"), 42 Pa.C.S. §§ 9541-9546. We affirm.

On direct appeal, a prior panel of this Court summarized the factual history of this case as follows:

> On the morning of May 14, 2009, the victim, Davon Young, dropped off Soneida Goshay at his sister, Donika Gay's residence in St. Clair Village. St. Clair Village was a close knit, yet often violent, housing project community in the City of Pittsburgh, Allegheny County. Young was accompanied by Aaron Doswell, and Goshay was left in the company of another of Young's sisters, Nikki Gay, who was at the residence watching Donika's two young children. Young and Doswell left the area.
>
> While the two women were at the residence, Appellant's cousin, Tameika [last name unknown] came to the home looking for Young to confront him about money that he owed to her. Tameika was very upset about the matter, asking whether

Young still drove a silver vehicle, and emphasizing that she needed her money. Tameika left but stated that she was going to call off work to get her "gun" to address the matter.

Late that afternoon Young and Doswell returned to pick up Goshay. Young was driving the silver vehicle that Tameika referenced early in the day. Nikki Gay informed Young of the circumstances of Tameika's visit, and Young unsuccessfully attempted to contact Tameika by phone.

Young, Goshay, and Doswell began to leave the area with Young driving the silver vehicle on Cresswell Street which exists [sic] St. Clair Village. As they drove along Cresswell Street, Appellant pursued the vehicle on foot, getting Young's attention by yelling, "yo yo yo". Young recognized Appellant, stopped the car, and got out of the vehicle to speak with Appellant.

Appellant confronted Young about the money ($500) owed to him. Appellant became agitated by Young's lack of an appropriate response. As the argument continued Blaine Revis, a relative of Appellant, approached and handed Appellant a semiautomatic pistol. Appellant chambered a round and walked over to Young's vehicle, took the keys from the ignition and angrily told Goshay and Doswell that he would kill all of them. He told Goshay to get out of the vehicle and "go hide". He ordered an unknown male to watch Doswell as he sat in the vehicle. Goshay left, returned to the Gay residence and alerted Nikki Gay that Young was in danger. Nikki Gay frantically ran toward Cresswell Street.

Appellant again approached Young and the argument resumed. Appellant swung at Young and missed. Young started to retaliate but apparently thought better of it because Appellant was armed. Appellant stepped back and pointed the gun at Young. Appellant then shot Young multiple times, and Young collapsed to the ground. Appellant turned to persons in the immediate area and stated, "Don't you all mother fuckers think you should be going somewhere". Appellant fled the area disposing of the weapon as he did so. Nikki Gay arrived to find her brother collapsed on the ground in an obviously life threatening condition.

Young was emergently transported to a local hospital but died shortly thereafter. An autopsy indicated that Young was

shot 3-5 times with the fatal wound being a gunshot wound to the trunk. That bullet perforated the descending aorta-the largest artery in the body; caused massive internal bleeding and death.

The police investigation soon led to the identification of Appellant.

*Commonwealth v. Watson*, 856 WDA 2011, 75 A.3d 562 (Pa. Super. filed April 23, 2013) (unpublished memorandum at 1-3) (internal citations and footnotes omitted).

As a result of this incident, Appellant was tried before a jury on October 15-22, 2010, and was found guilty of first degree murder. Appellant was sentenced to a period of life imprisonment without the possibility of parole. Post-sentence motions were timely filed and the trial court denied them on May 2, 2011. Appellant filed a direct appeal to this Court on May 27, 2011. This Court affirmed Appellant's judgment of sentence on April 23, 2013, and Appellant's petition for allowance of appeal to our Supreme Court was denied on September 12, 2013. *Commonwealth v. Watson*, 856 WDA 2011, 75 A.3d 562 (Pa. Super. filed April 23, 2013), *appeal denied*, 239 WAL 2013, 74 A.3d 1031 (Pa. filed September 12, 2013).

Appellant filed a *pro se* PCRA petition on December 20, 2013. Counsel was appointed, and an amended PCRA petition was filed on July 28, 2014. A second amended petition was filed on December 23, 2014. The PCRA court issued a notice of intent to dismiss Appellant's petition on June 9, 2015, and

an order denying Appellant's PCRA petition was entered on July 9, 2015.

Appellant filed a timely notice of appeal on August 10, 2015.[1] Both parties

complied with Pa.R.A.P. 1925.

Appellant presents the following issues for our review:

I.     Was [Appellant's] claim for relief properly cognizable under the Post-Conviction Relief Act?

II.     Did the lower court abuse its discretion in denying the petition alleging counsel's ineffectiveness without a hearing, where [Appellant] established the merits of the claim that trial counsel was ineffective for failing to move to exclude the admission into evidence of prison telephone calls made using another inmate's identification number insofar as the Commonwealth failed to authenticate that the calls were made by [Appellant]?

III.     Did the lower court abuse its discretion in denying the petition alleging counsel's ineffectiveness without a hearing, where [Appellant] established the merits of the claim that trial counsel was ineffective for failing to object to the prosecutor's misleading and prejudicial repeated references to another murder for which [Appellant] was not on trial during opening remarks and closing arguments?

Appellant's Brief at 4.

Our standard of review of an order denying PCRA relief is whether the

record supports the PCRA court's determination and whether the PCRA

court's determination is free of legal error. ***Commonwealth v. Phillips***, 31

---

[1] We note that because August 8, 2015, fell on a Saturday, Appellant had until Monday, August 10, 2015, to file his notice of appeal. ***See*** 1 Pa.C.S. § 1908 (stating that, for computations of time, whenever the last day of any such period shall fall on Saturday or Sunday, or a legal holiday, such day shall be omitted from the computation.); ***Commonwealth v. Green***, 862 A.2d 613, 618 (Pa. Super. 2004).

A.3d 317, 319 (Pa. Super. 2011) (citing **Commonwealth v. Berry**, 877 A.2d 479, 482 (Pa. Super. 2005)). The PCRA court's findings will not be disturbed unless there is no support for the findings in the certified record. **Id**. (citing **Commonwealth v. Carr**, 768 A.2d 1164, 1166 (Pa. Super. 2001)). Furthermore, it is well established that "[t]he PCRA court need not hold a hearing on every issue appellant raises, as a hearing is only required on genuine issues of material fact." **Commonwealth v. Albrecht**, 994 A.2d 1091, 1093 (Pa. 2010) (citations and quotations omitted). "A trial court's decision not to hold a hearing will only be reversed when the trial court abused its discretion." **Commonwealth v. Collins**, 888 A.2d 564, 579 (Pa. 2005).

In his first issue, Appellant argues that his claim for relief is properly cognizable under the PCRA. Appellant's Brief at 23. Appellant asserts that his petition was filed within one year of the date his sentence became final and that he is currently serving a sentence of imprisonment for crimes for which he was convicted. **Id.** He further contends that his challenges to the effectiveness of counsel are recognized under the PCRA. **Id.** Finally, he asserts that his issues currently raised have not been previously litigated, nor have they been waived. **Id.**

We agree with Appellant's assertion that Appellant's claim for relief is properly cognizable under the PCRA.[2] 42 Pa.C.S. §§ 9541-9546; *see also* ***Commonwealth v. Lesko***, 15 A.3d 345, 360-361 (Pa. 2011) (outlining criteria for claims cognizable under the PCRA). Thus, we shall review the two additional issues Appellant presents on appeal.

Appellant's second and third claims allege ineffective assistance of counsel ("IAC"). When considering an allegation of IAC, counsel is presumed to have provided effective representation unless the PCRA petitioner pleads and proves that: (1) the underlying claim is of arguable merit; (2) counsel had no reasonable basis for his or her conduct; and (3) appellant was prejudiced by counsel's action or omission. ***Commonwealth v. Spotz***, 84 A.3d 294, 311 (Pa. 2014). "In order to meet the prejudice prong of the ineffectiveness standard, a defendant must show that there is a 'reasonable probability that but for counsel's unprofessional errors, the result of the proceeding would have been different.'" ***Commonwealth v. Reed***, 42 A.3d 314, 319 (Pa. Super. 2012). A claim of ineffective assistance of counsel will fail if the petitioner does not meet any one of the three prongs. ***Commonwealth v. Simpson***, 66 A.3d 253, 260 (Pa. 2013). "The burden

---

[2] We note that there has been no suggestion by the Commonwealth or the PCRA court that Appellant's claim for relief was not cognizable under the PCRA.

of proving ineffectiveness rests with Appellant." ***Commonwealth v. Rega***, 933 A.2d 997, 1018 (Pa. 2007).

In his second issue, Appellant argues that the PCRA court abused its discretion in denying his amended PCRA petition without a hearing based on his claim that trial counsel was ineffective. Appellant's Brief at 24. Appellant posits that trial counsel was ineffective for failing to move to exclude from evidence transcripts of prison telephone calls that were made using another inmate's identification number. ***Id.*** Appellant avers that the Commonwealth failed to authenticate that the calls were made by Appellant and therefore the calls were improperly admitted into evidence. ***Id.***

Regarding the authentication of evidence, Pa.R.E. 901 provides as follows, in relevant part:

> **Rule 901. Authenticating or Identifying Evidence**
>
> **(a) In General.** To satisfy the requirement of authenticating or identifying an item of evidence, the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is.
>
> **(b) Examples.** The following are examples only--not a complete list--of evidence that satisfies the requirement:
>
> * * *
>
>> (4) *Distinctive Characteristics and the Like*. The appearance, contents, substance, internal patterns, or other distinctive characteristics of the item, taken together with all the circumstances.
>>
>> (5) *Opinion About a Voice*. An opinion identifying a person's voice--whether heard firsthand or through mechanical or electronic transmission or recording--

- 7 -

based on hearing the voice at any time under circumstances that connect it with the alleged speaker.

(6) *Evidence About a Telephone Conversation*. For a telephone conversation, evidence that a call was made to the number assigned at the time to:

> (A) a particular person, if circumstances, including self-identification, show that the person answering was the one called; or

> (B) a particular business, if the call was made to a business and the call related to business reasonably transacted over the telephone.

Pa.R.E. 901.

Furthermore, the comment to Pa.R.E. 901 provides, in relevant part,

as follows:

Comment: Pa.R.E. 901(a) is identical to F.R.E. 901(a) and consistent with Pennsylvania law. The authentication or identification requirement may be expressed as follows: When a party offers evidence contending either expressly or impliedly that the evidence is connected with a person, place, thing, or event, the party must provide evidence sufficient to support a finding of the contended connection. *See Commonwealth v. Hudson*, 489 Pa. 620, 414 A.2d 1381 (1980); *Commonwealth v. Pollock*, 414 Pa. Super. 66, 606 A.2d 500 (1992).

In some cases, real evidence may not be relevant unless its condition at the time of trial is similar to its condition at the time of the incident in question. In such cases, the party offering the evidence must also introduce evidence sufficient to support a finding that the condition is similar. Pennsylvania law treats this requirement as an aspect of authentication. *See Commonwealth v. Hudson*, 489 Pa. 620, 414 A.2d 1381 (1980).

> Demonstrative evidence such as photographs, motion pictures, diagrams and models must be authenticated by evidence sufficient to support a finding that the demonstrative evidence fairly and accurately represents that which it purports to depict. *See Nyce v. Muffley*, 384 Pa. 107, 119 A.2d 530 (1956).
>
> * * *
>
> Pa.R.E. 901(b)(4) is identical to F.R.E. 901(b)(4). Pennsylvania law has permitted evidence to be authenticated by circumstantial evidence similar to that discussed in this illustration. The evidence may take a variety of forms including: evidence establishing chain of custody, *see Commonwealth v. Melendez*, 326 Pa. Super. 531, 474 A.2d 617 (1984); evidence that a letter is in reply to an earlier communication, *see Roe v. Dwelling House Ins. Co. of Boston*, 149 Pa. 94, 23 A. 718 (1892); testimony that an item of evidence was found in a place connected to a party, *see Commonwealth v. Bassi*, 284 Pa. 81, 130 A. 311 (1925); a phone call authenticated by evidence of party's conduct after the call, *see Commonwealth v. Gold*, 123 Pa. Super. 128, 186 A. 208 (1936); and the identity of a speaker established by the content and circumstances of a conversation, *see Bonavitacola v. Cluver*, 422 Pa. Super. 556, 619 A.2d 1363 (1993).
>
> Pa.R.E. 901(b)(5) is identical to F.R.E. 901(b)(5). Pennsylvania law has permitted the identification of a voice to be made by a person familiar with the alleged speaker's voice. *See Commonwealth v. Carpenter*, 472 Pa. 510, 372 A.2d 806 (1977).

Pa.R.E. 901, cmt. Moreover, this Court has explained that "when seeking to introduce testimony as to the content of a telephone conversation, the identity of the caller may be established by circumstantial evidence." *Commonwealth v. Stewart*, 450 A.2d 732, 733 (Pa. Super. 1982).

The Commonwealth presented the testimony of Samuel Pastor ("Pastor") and Detective Vonzal Boose ("Detective Boose") for purposes of authenticating the telephone calls at issue. Pastor was an employee of the

Allegheny County Jail ("the Jail"), assigned to the internal affairs division. N.T., 10/20/10, at 375. Pastor was familiar with the telephone system in the Jail. *Id.* He described the process by which inmates at the Jail are permitted to make telephone calls. *Id.* at 375-376. He explained that when an inmate arrives at the Jail, he is assigned a distinctive PIN number that allows him to make telephone calls to persons outside the Jail. *Id.* at 375. Pastor further explained that because all telephone calls made from the Jail to outside phone numbers are recorded, inmates often switch PIN numbers in an attempt to fool the Jail officials, conceal their identity, and evade detection. *Id.* at 376-379, 383. Pastor confirmed that Appellant and another inmate, Gerod Garrett, were on the same pod at the Jail at the same time, and thereby had access to each other. *Id.* at 383. In addition to a PIN number, each incoming inmate is assigned a Department of Corrections ("DOC") number, which is unique to the inmate and remains with that inmate, even if the inmate leaves the Jail and later returns. *Id.* at 376. Appellant's DOC number is 143451. *Id.*

Detective Boose was employed as a detective with the City of Pittsburgh homicide squad. N.T., 10/20/10, at 385. In the course of his investigation into the shooting death of Davon Young, Detective Boose requested from the Jail the recordings of telephone calls made by Appellant. *Id.* at 387. Detective Boose received and listened to the telephone call recordings that were made using Appellant's PIN number. *Id.* at 387.

Detective Boose stated that he did not hear anything relevant to his investigation on those calls. *Id.* at 387. As a result, Detective Boose gathered the telephone numbers that received calls made from the Jail using Appellant's PIN number. *Id.* at 387. Detective Boose then cross-referenced those numbers with other calls made from the Jail, and discovered additional calls from the Jail to those same outside telephone numbers, but made using another inmate's PIN number. *Id.* at 387-388. Detective Boose explained that he conducted this cross-referencing of telephone numbers based on his knowledge that "normally inmates switch [PIN] numbers thinking that we wouldn't listen and tricks that they use that we discover." *Id.* at 388. Based on his cross-reference of the telephone calls made, Detective Boose determined that Appellant had used the PIN number assigned to Gerod Garrett to make the telephone calls.[3] *Id.* at 388.

The Commonwealth presented at trial the audio recordings and accompanying transcripts of twenty-nine telephone calls made from the Jail using Gerod Garrett's PIN number during the period between June 11, 2009, and August 22, 2009. N.T., 10/20/10, at 379-380, 393-394; Exhibits 39-68 and 39A-68A. The Commonwealth and Appellant stipulated to the admission of these exhibits. N.T., 10/20/10, at 379. Following the playing of each recording, Detective Boose identified the parties on the call. *Id.* at 394-407.

---

[3] Appellant's counsel stipulated that the PIN number used for these calls belonged to Gerod Garrett. *Id.* at 388.

In each call, Detective Boose identified Appellant as one of the parties speaking on the call. *Id.* at 394-407. In many of the calls, Appellant provided information that identified him as the inmate making the call, despite the use of Gerod Garrett's PIN number. *Id.* at 394-407.

Specifically, Exhibit 54 was a call between Jennifer Cheeseman and Appellant. N.T., 10/20/10, at 401; Exhibit 54A.[4] During this call, Appellant provided his unique DOC number, 143451, so that Jennifer Cheeseman could send Appellant mail. N.T., 10/20/10, at 401;[5] Exhibit 54A. In several of the calls, the speaker identified himself by Appellant's nickname "Scrooge," and referenced his brothers, "Grease" and "KO," numerous times.[6] N.T., 398, 399, 400, 401, 405, 406; Exhibits 47A, 49A, 51A, 55A, 66A, 68A. On these calls, Appellant also discussed his court dates, N.T., 10/20/10, at 314, 400, 405; Exhibits 51, 66, the details of his charges, N.T., 10/20/10, at 400; Exhibit 53, and repeatedly directed his brothers to locate the witnesses relevant to his case and eliminate them, even talking about "some girl [who] got shot up there" on the day that Monnica ("Nikki") Gay, a witness who

---

[4] The transcripts correlating to each call were labeled the same as the actual recording, with the addition of an "A" after each number.

[5] During his testimony, Detective Boose inadvertently transposed two of the numbers in Appellant's DOC number.

[6] Evidence introduced at trial established that Appellant went by the nickname "Scrooge," Appellant's brother Kevin Watson went by the nickname "KO," and Appellant's other brother Charles Cabiness went by the nickname "Grease." N.T., 10/15/10, at 188, 429.

testified against Appellant at his preliminary hearing on the Davon Young murder charge, was killed. N.T., 10/20/10, at 397-399, 405, 406; Exhibits 46-50, 65, 68.

Indeed, on two of the calls, Appellant explained to the other party why he could speak freely on the recorded line. The following exchange, in relevant part, took place during the call placed on June 17, 2009, and transcribed at Exhibit 50A:

Kevin Watson:    Alright, that don't mean cuz, look, what motherfuckers see us doing don't mean we're not doing shit when you don't see us, cuz, you gotta understand that, we're not just chilling in the fuckin' hood, cuz, like niggas be out!

And I'm not about to talk about this shit on the phone, cuz.

Luzay Watson:    This ain't my PIN number, I don't give a fuck about this number, cuz. That's why I'm saying what the fuck I'm saying, cuz.

Exhibit 50A at 3. On a call placed July 16, 2009, Appellant explained to the other party on the call, in light of that person's hesitation to speak freely that: "Naw, this ain't my PIN number, you ain't gotta worry about nothin'." Exhibit 65A at 1.

The trial court came to the following conclusion in determining that the calls were properly authenticated and provided this explanation to Appellant in its notice of intent to dismiss Appellant's PCRA petition pursuant to Pa.R.Crim.P. 907:

[Appellant] claims that counsel was ineffective for failing to move to exclude the admission into evidence of prison telephone calls from another inmate's PIN number, based on the argument that the Commonwealth failed to authenticate that the calls were made by [Appellant]. The Commonwealth offered sufficient authentication evidence to support a finding that [Appellant] was the person speaking in those phone calls. Specifically, Detective Vonzal Boose: (1) listened to phone calls made by [Appellant] using his PIN; (2) cross-referenced the number called with other inmate's PINs used to call those same numbers; (3) identified that Gerod Garrett's PIN called the same numbers that were called by [Appellant] using his own PIN; (4) listened to the calls made to those numbers under Garrett's PIN; and (5) identified [Appellant's] voice in those phone calls. Additionally, [Appellant] identified himself on the phone calls using Garrett's PIN by providing his unique DOC number to Jennifer Cheeseman, introducing himself by his street name ("Scrooge") and referencing his brother's by their street names, by discussing his court dates and charges, and stating that he could talk freely because he was not using his own PIN. As such, Detective Boose was able to identify [Appellant] was the caller on the contested calls based on voice identification and [Appellant's] own identification. The underlying claim lacks merit and [Appellant] was not prejudiced by counsel's failure to object to the admission of this evidence.

Notice of intention to dismiss pursuant to Pa.R.Crim.P. 907, at 1-2.

We agree. The extensive circumstantial evidence in this case establishes that Appellant was the speaker on the recorded telephone calls using Gerod Garrett's PIN number. *Stewart*, 450 A.2d at 733. Additionally, after having listened to the multiple recordings made by Appellant using his own PIN number and during which he identified himself, Detective Boose would have developed a basis upon which to recognize Appellant's voice. Thus, Detective Boose's identification of Appellant's voice is based, not only on the significant circumstantial evidence presented at trial, but also on his

own recognition of Appellant's voice on the recordings. Thus, the recordings and the related transcripts were properly authenticated and admitted into evidence. Accordingly, there is no underlying merit to Appellant's claim that counsel was ineffective for failing to move to exclude from admission these recorded calls. ***Spotz***, 84 A.3d at 311. Because the ineffectiveness claim lacked arguable merit, the trial court did not abuse its discretion by denying the petition alleging counsel's ineffectiveness without a hearing. ***See Commonwealth v. Jordan***, 772 A.2d 1011, 1014 (Pa. Super. 2001) ("There is no right to an evidentiary hearing on a PCRA petition, and the PCRA court may decline to hold a hearing if the claims are patently frivolous and without a trace of support in the record.") Appellant's second claim lacks merit.

In his third issue, Appellant again argues that the PCRA court abused its discretion in denying, without a hearing, his amended PCRA petition alleging ineffective assistance of counsel. Appellant's Brief at 32. In this context, Appellant asserts that trial counsel was ineffective for failing to object to the prosecutor's misleading and prejudicial repeated references to the murder of Nikki Gay, for which Appellant was not on trial, during opening remarks and closing argument. ***Id.*** at 32. The prosecutor referenced the fact that Appellant's brother, Charles Cabiness, had been arrested and charged in connection with the murder of Nikki Gay, who had testified at Appellant's preliminary hearing a month prior to her death. ***Id.*** Appellant

maintains that introduction of this evidence was extremely prejudicial as opposed to probative regarding who committed the crime in the instant matter. *Id.* at 33. Appellant posits that these remarks effectively stripped Appellant of the presumption of innocence. *Id.* at 37. Appellant further asserts that comments made during the prosecutor's closing statement, referencing the murder of Nikki Gay and the fact that she was a witness against Appellant, improperly directed the jury to find Appellant guilty because he had Nikki Gay killed. *Id.* at 38. Despite these alleged improprieties, Appellant's trial counsel raised no objections to the comments made during the opening and closing statements. *Id.* at 39. Appellant asserts that he was prejudiced by counsel's omission because if counsel had timely and properly objected, there is a reasonable probability that the outcome of the proceeding would have been different. *Id.* at 43.

In addressing prosecutorial misconduct alleged to have occurred in opening and closing statements, our Supreme Court has provided the following guidance:

> In accord with the long-standing principle that a "prosecutor must be free to present his or her arguments with logical force and vigor," this Court has permitted prosecutorial advocacy "as long as there is a reasonable basis in the record for the [prosecutor's] comments." Prosecutorial comments based on the evidence or reasonable inferences therefrom are not objectionable, nor are comments that merely constitute oratorical flair. Furthermore, the prosecution must be permitted to respond to defense counsel's arguments. Any challenged prosecutorial comment must not be viewed in isolation, but rather must be considered in the context in which it was offered.

It is improper for a prosecutor to offer his or her personal opinion as to the guilt of the accused or the credibility of any testimony. However, it is well within the bounds of proper advocacy for the prosecutor to summarize the facts of the case and then ask the jury to find the accused guilty based on those facts.

The standard by which the court considers allegations of improper prosecutorial comments is a stringent one:

> Comments by a prosecutor constitute reversible error only where their unavoidable effect is to prejudice the jury, forming in their minds a fixed bias and hostility toward the defendant such that they could not weigh the evidence objectively and render a fair verdict.

*Commonwealth v. Chmiel*, 30 A.3d 1111, 1146-1147 (Pa. 2011).

Appellant objects to the following comments made during the prosecution's opening statement:

> What is going to make that more obvious and difficult is when you find out that, in fact, one of the Commonwealth's witnesses, one of the people that was potentially to testify in this case was murdered because they already testified at a previous hearing.

> * * *

> One of those witnesses, her name was Monnica Gay, who testified at that hearing and within a month of that time that she testified she was found dead, shot in the head in St. Clair Village. So keep that in mind, all right. Keep that in the back of your heads when you see these witnesses testify because it is not an easy thing. Not only do they have to sit here and face the person that they are accusing they know, in the back of their mind a witness was murdered.

> Now, hopefully from watching the news, TV movies, you know there is a common theme about snitching. It is not done in this community. In that neighborhood you don't do that. The common phrase is snitches end up in ditches. That is what ended up [happening] to one of the witnesses in this case.

- 17 -

Appellant's Brief at 36 (citing N.T., 10/18/10, at 37-39).

Viewing the opening statement in its entirety, however, it is clear that in this portion of the statement, the prosecutor was attempting to explain why witnesses, who were about to testify, would likely appear to be uncooperative or unhelpful to the Commonwealth at trial, despite their proximity to the killing. The relevant subsequent comments omitted by Appellant provide this understanding:

> So while it might be your first instinct perhaps where you grew up if you see a crime that you report it to the police, it is not like that here. This is a different world entirely from what you are used to. It is going to be a common theme in this case. You are going to see it and a lot of the questions that you have is why didn't they do this, why didn't they do that? It is all coming back to that one thing they are afraid to testify. It is not done. They know what is going to happen to them if they do.
>
> This occurred May 14, 2009, Thursday, around 3:30p.m., kids getting out of school, a lot of people around, committed in broad daylight. Again, the same thing, to have the ability and the lack of fear to commit a murder like this in front of so many witnesses just goes to show you that they don't expect anyone to testify. They think they can get away with it. No one is going to come forward and in this case a lot of people didn't. You are going to hear that 15, so 10, 15 people were outside but I only have four people that were involved and two of which that actually saw it happen. Out of all the people that witnessed this, no one comes forward. Only four people in this case are going to testify and, in fact, two of those are people that actually witnessed it.

N.T., 10/18/10, at 38-40.

Thus, the discussion of the murder of Nikki Gay in the context of retaliation against witnesses was presented as an explanation of the

- 18 -

relationships among the parties involved in the case and a contextualization about the witnesses' potential apprehension in testifying. It was not an improper characterization by the prosecutor intended to inflame the jury or prejudice Appellant. Instead, the prosecutor's comments were based on the evidence, and the inferences therefrom, that would be presented at trial. *Chmiel*, 30 A.3d at 1147. Accordingly, we cannot agree that the prosecutor's comments related to Nikki Gay's death and retaliation against witnesses constituted prosecutorial misconduct.

Appellant next challenges comments made by the prosecutor in his closing statement. The following is the statement to which Appellant objects:

> Now the only point which I'm going to address that defense talked about because I'm not sure if you are able to pick up on it is this, that is about Niki Gay, Monnica Gay, her murder. The argument is that she had nothing to do with this, unrelated to this case. That is simply not true. She was killed because she testified against [Appellant]. He had her killed. He told his brother get rid of these witnesses. She is one of the witnesses they found and killed.

> * * *

> You are going to give [Appellant] – if you think he thought all of this through, he doesn't care who was killed. He isn't smart to realize which witness said what. He wants them all dead . . . Look at the message. Obviously it is going to scare to death anybody that would come forward. You heard them, witnesses were out there. It is not and should not be a surprise why only three of them testified.

Appellant's Brief at 38 (citing N.T, 10/21/10, at 467-468).

Again, we note that "[a]ny challenged prosecutorial comment must not be viewed in isolation, but rather must be considered in the context in which it was offered." *Chmiel*, 30 A.3d at 1147. Thus, viewing the closing statement in its entirety, it is apparent that the prosecutor was again attempting to explain why so few witnesses testified despite there being many more eyewitnesses. N.T., 10/21/10, at 468-469.[7]

Because none of Appellant's assertions of prosecutorial misconduct during opening and closing arguments has merit, Appellant cannot satisfy the arguable merit prong of the test for ineffective assistance of trial counsel. Accordingly, the PCRA court did not abuse its discretion by dismissing Appellant's PCRA petition without a hearing. *Jordan*, 772 A.2d at 1014. Thus, Appellant's third claim also fails.

Order affirmed.

---

[7] In his appellate brief, Appellant also challenges the prosecutor's comments regarding the testimony of a witness, Chelsea Rankin. Appellant's Brief at 38. This issue, however, was not raised in Appellant's Pa.R.A.P. 1925(b) statement and is therefore waived. *Commonwealth v. Lord*, 719 A.2d 306, 309 (Pa. 1998) ("Any issues not raised in a Pa.R.A.P. 1925(b) statement will be deemed waived.").

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 8/11/2016