J-A12034-24

2024 PA Super 184

| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|---|
| v. | : | |
| ANTHONY JONES | : | |
| Appellant | : | No. 1734 EDA 2022 |

Appeal from the Judgment of Sentence Entered May 24, 2022
In the Court of Common Pleas of Philadelphia County Criminal Division at
No(s): CP-51-CR-0009135-2019

| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|---|
| v. | : | |
| ANTHONY JONES | : | |
| Appellant | : | No. 1736 EDA 2022 |

Appeal from the Judgment of Sentence Entered May 24, 2022
In the Court of Common Pleas of Philadelphia County Criminal Division at
No(s): CP-51-CR-0000018-2020

BEFORE: PANELLA, P.J.E., KING, J., and STEVENS, P.J.E.[*]

OPINION BY STEVENS, P.J.E.: **FILED AUGUST 19, 2024**

In these consolidated appeals,[1] Anthony Jones appeals from the May 24, 2022 aggregate judgment of sentence of 31 to 64 years' imprisonment,

---

[*] Former Justice specially assigned to the Superior Court.

[1] Appellant's appeals at Nos. 1734 EDA 2022 and 1736 EDA 2022 were **sua sponte** consolidated by this Court on September 13, 2022.

followed by 3 years' probation, imposed after a jury found him guilty of rape, involuntary deviate sexual intercourse ("IDSI"), sexual assault, strangulation, burglary, and intimidation of a witness.[2]  After careful review, we affirm the judgment of sentence.

The trial court summarized the relevant facts of this case as follows:

> [O]n November 5, 2019, the complainant Sade Levan, had called [Appellant], whom she had known well as "Primo," to purchase cocaine from him.
>
> Appellant agreed and instructed Ms. Levan to meet him at the 318 Bar.  Upon her arrival, Appellant told Ms. Levan to get into his car.  Appellant drove Ms. Levan to a nearby Chinese store to buy food to eat and then entered another bar, 7 Bar.  Ms. Levan paid Appellant $80.00 for the drugs and his food.  Ms. Levan agreed to "hang out" with Primo.  They picked up marijuana and beer and headed to Ms. Levan's home located on the 300 block of North Horton Street in Philadelphia. They arrived at her house at around 2:00 a.m. on November 6, 2019.
>
> While in her home, Ms. Levan used a small amount of cocaine and marijuana with Appellant.  When Appellant cried about his daughter's recent troubles, the complainant prayed with him. Appellant then asked Ms. Levan, who is a tiny and thinly framed female, to physically hold him. When she refused, Appellant tore her clothes off, pinned her down, and forcibly performed oral sex on her while she repeatedly begged him to stop, telling him it was not too late to do so.
>
> Appellant, who is a physically large, girthed individual, responded to her pleas, by balling his fist up and

_____

[2] 18 Pa.C.S.A. §§ 3121(a)(1), 3123(a)(1), 3124.1, 2718(a)(1), 3502(a)(1)(i), and 4952(a)(1), respectively.

saying, "Bitch, I'll punch your teeth out. Stay still. Shut up." Ms. Levan fought Appellant and struggled to find her phone and began getting dressed, which had been more difficult due to the spilled beer cans and clothing covering the floor. When Appellant found his jeans on the floor, he pulled some money out of the pockets, and screamed at her, "You stole my money. I'm going to kill you, bitch." When Ms. Levan cried that she had not taken any money, Appellant said, "Say another word and I'm going to kill you like I killed the last bitch."

Ms. Levan picked up a beer bottle and threatened to hit Appellant with it. Appellant grabbed and choked her, squeezing her neck so hard that she had fought for air. He put his knee on her head and his hands around her neck, forcing her face into the couch. Ms. Levan lost consciousness, and when she awoke, she was disoriented. Surprised that she had survived, Appellant remarked, "I killed you. You weren't breathing for minutes. You laid there dead."

Ms. Levan pleaded with Appellant to allow her to leave her home. Appellant responded by asking why she had "made" him perform oral sex on her and why she had taken his money. When Ms. Levan complained that he had pinned her down and raped her, Appellant replied that she had made him late and that he was going to kill her. Appellant then demanded that Ms. Levan get dressed and take him to an ATM because he wanted all her money.

As the complainant walked toward the door, Appellant grabbed her and pulled her pants down and vaginally raped her again before she could exit her home. He ejaculated on her back. Once Ms. Levan found her phone, Appellant told her, "Bitch, you better not call the cops." Around 7:00 a.m., they walked together out of her house. Ms. Levan saw a neighbor across the street, ran over, and told the neighbor what happened. She reported the attack and provided a capsule of events to the responding uniformed 19th District City of Philadelphia Uniformed Police Officer Sharif. Officer Sharif submitted a report summarizing

- 3 -

his contact with the complainant to the City of Philadelphia Special Victim's Unit.

Ms. Levan had reported that she had been repeatedly physically assaulted and raped three times over the course of the early morning hours. As a result of the attack, Ms. Levan had loose teeth, a black eye, bruises on her back and legs, and various scratches. Ms. Levan's injuries had been subsequently documented and photographed by members of the City of Philadelphia Police Department.

. . . .

Before Appellant had been formally arrested and charged with the offenses related to the reported rape and assault of Sade Levan, Appellant repeatedly threatened Ms. Levan over the telephone for reporting his attack. Ms. Levan's sister, Noni Williams, stayed with Ms. Levan because she had been too frightened to stay at her home alone. Ms. Williams and their mother had also been aware of the repeated calls and threats that Appellant had made following her sister's initial report to the police department.

On November 7, 2019 around 2:23 a.m., Appellant physically broke through the front window and again entered Ms. Levan's home. The two sisters huddled together in Ms. Levan's upper floor bedroom when they had been awakened by noises downstairs. They quickly pushed Ms. Levan's dresser against the bedroom door to barricade themselves. Appellant forced his way inside the bedroom and casually complained that Ms. Levan had not returned his phone calls.

Appellant then directed both frightened tiny women not to touch their phones or call the cops and to go downstairs. Once downstairs, Appellant showed them a collected bag of feces. He explained, "I could kill both of you and no one would know. That's why I pooped in the bag, so I don't leave DNA." He told them that they were lucky that he did not bring his gun. Appellant bragged that he had climbed in

through the window because he needed sexual "release."

During his taunts, Appellant physically picked up Ms. Levan several times, squeezed her, and smacked her buttocks. He also offered the women cocaine and started using it himself in front of them. Unbeknownst to Appellant, Ms. Levan's sister secretly texted the police department for help. As a result, Appellant was still inside Ms. Levan's house when police arrived and arrested him. Videos were made of the responding police officers' volatile interactions with all parties. Ms. Levan and her sister along with their Aunt Lena were transported to the City of Philadelphia Special Victim's Unit ("SVU") for formal interviews. The complainant's mom and owner of the residence, sister and aunt were also interviewed.

During the investigation, Ms. Levan's injuries were photographed and documented. Ms. Levan was examined by a registered nurse and sexual assault nurse examiner James Owens at the Philadelphia Sexual Assault Response Center ("PSARC") on November 8, 2019 at 9:00 p.m. The damaged front window and inside of the premises including the referenced bag of feces in Ms. Levan's residence was documented and photographed.

Pursuant to stipulation that had been introduced at trial, on November 8, 2019 at 9:00 p.m. Ms. Levan had reported to the "C.F.N." Nurse James Owens during her examination that during the ongoing rape and assault between November 4, 2019 and November 5, 2019, the attacker whom she had known as "Primo" had put his penis inside her vagina and, his mouth on her vagina and his mouth on her breasts. Nurse Owens had collected a sexual assault collection kit from Sade Levan which had included a vaginal swab, perineum swab and bilateral swabs of her nipples as well as a DNA reference sample for Sade Levan's DNA. The swabs were sealed and then placed on Philadelphia Property Receipt and submitted to the Philadelphia Police Department's Office of Forensic Science for testing. Appellant was arrested on

> November 7, 2019 for Burglary and Witness
> Intimidation related to the second incident….

Trial court opinion, 7/17/23 at 2-6.

On October 15, 2021, Appellant proceeded to a jury trial before the Honorable Anne Marie Coyle. Following a six-day trial, Appellant was found guilty of rape, IDSI, sexual assault, strangulation, burglary, and intimidation of a witness on October 22, 2021. As noted, Appellant was ultimately sentenced to an aggregate term of 31 to 64 years' imprisonment, followed by 3 years' probation, on May 24, 2022. Appellant was also ordered to register as a Megan's Law Tier III Sexual Offender for the rest of his life. Appellant filed a timely post-sentence motion that was denied by the trial court on June 21, 2022. On June 28, 2022, Appellant filed two separate timey notices of appeal that were docketed at 1734 EDA 2022 and 1736 EDA 2022, respectively. As noted, the appeals were consolidated **sua sponte** by this

Court on September 13, 2022.[3]  Appellant and the trial court have complied

with Pa.R.A.P. 1925.

Appellant raises the following issues for our review:

>  A.    Was it a violation of Appellant's due process
>         rights and his right to a fair trial where, after the
>         attorney for the Commonwealth had concluded
>         her questioning of the complainant, the trial
>         judge directed the ADA to continue to examine
>         the witness and then did so herself in order to
>         make certain the elements of one of the charges
>         were met?
>
>  B.    Did the trial court violate Appellant's Sixth
>         Amendment right to confront and cross examine
>         the complainant on a matter that would have
>         revealed her lack of credibility and motive to
>         fabricate which denied Appellant's right to
>         present a complete defense?
>
>  C.    Did the trial court err and abuse its discretion
>         when it denied [Appellant's] request for a

_____

[3] We note that Appellant's notices of appeal implicate *Commonwealth v. Walker*, 185 A.3d 969 (Pa. 2018).  Although these notices of appeal list two trial court docket numbers, each has a different number check marked.  In *Commonwealth v. Creese*, 216 A.3d 1142 (Pa.Super. 2019), a panel of this Court construed *Walker* to mean that this Court "may not accept a notice of appeal listing multiple docket numbers, even if those notices are included in the records of each case" and that "a notice of appeal may contain only one docket number."  *Creese*, 216 A.3d at 1144.  That pronouncement was expressly overruled in *Commonwealth v. Johnson*, 236 A.3d 1141 (Pa.Super. 2020) (*en banc*), *appeal denied*, 242 A.3d 304 (Pa. 2020).  In *Johnson*, this Court held that even though the appellant filed multiple notices of appeal, each listing multiple trial court docket numbers, the appeals should not be quashed because the appellant filed an appropriate number of appeals. *Id.* at 1148.  The *Johnson* Court was also persuaded by the fact that the appellant had italicized only one trial court docket number in each notice of appeal, noting that this made it clear that the clerk of courts did not play a role in typing separate notices of appeal.  *Id.*  Based on the foregoing, we find that quashal is not warranted in this instance.

missing witness jury instruction where the names and locations of the witnesses were solely within the knowledge and reach of the Commonwealth, where there was no explanation from the Commonwealth why these witnesses were not subpoenaed, their testimony would not have been cumulative or unimportant, and where the instruction could have affected the outcome of the case?

D.   Did the trial court violate Appellant's Fifth Amendment right to remain silent when it used his decision to not speak with presentence and mental health evaluators upon advice of counsel as a ground to increase the sentence?

Appellant's brief at 6.

## A.

Appellant first argues that the trial court violated his right to due process and a fair trial under the Fourteenth Amendment when it "intervened to act as an advocate for the Commonwealth" and briefly questioned the victim during re-direct examination. *Id.* at 38. We disagree.

> The Fourteenth Amendment guarantees that no state "shall … deprive any person of life, liberty, or property without due process of law." U.S. Const. XIV, Sec. 1. Due process concerns extend to the actions of the judiciary; accordingly, litigants are guaranteed an absence of actual bias on the part of any judge adjudicating their case. … While a fair trial is indeed a basic requirement of due process, most matters relating to judicial disqualification [do] not rise to a constitutional level.

*Commonwealth v. Fears*, 250 A.3d 1180, 1193 (Pa. 2021) (some internal quotation marks and case citation omitted; brackets in original), *cert. denied*, ___ A.3d ___, 142 S. Ct. 1235 (2022).

Instantly, the record reflects that the trial court asked the victim the following questions after sustaining Appellant's objection to her testimony speculating what Appellant meant when he told her that "the cops are looking for him." Notes of testimony, 10/20/21 at 24.

> THE COURT: Excuse me. Sustained as to speculation, but can you remember, ma'am, what, if anything, he said in reference to reporting to police officers in any way, shape, or form. I want you to think back and just let us know what he said, not what you believe why he was saying something. What, if anything, did he say in reference to the reporting to the police in any way, shape, or form[?]
>
> THE WITNESS: He said that he was running from the cops all day looking over his shoulder. What did I tell the cops.
>
> THE COURT: You recall what your response was to him, if any?
>
> THE WITNESS: Yes.
>
> THE COURT: What was it?
>
> THE WITNESS: I had told him that I did not call the cops on him and I've been resting all day.
>
> THE COURT: Okay.

*Id.* at 24-25.

This Court has repeatedly recognized that

[a] trial court has a right and sometimes a duty to question a witness to clarify existing facts, though not in a biased or protracted manner. A court must exercise that right with caution, and with due regard for the common law preference for clarification by adversarial cross-examination. Trial courts should not ask questions that usurp or unduly encroach upon the fact-finding function of the jury by suggesting judicial disbelief of particular testimony or an opinion on one or more issues for one side against another.

*Commonwealth v. Hickson*, 290 A.3d 705 (Pa.Super. 2022) (unpublished memo at *3), *appeal denied*, 300 A.3d 359 (Pa. 2023), citing *Commonwealth v. King*, 549 A.2d 195, 197 (Pa.Super. 1998), *appeal denied*, 563 A.2d 496 (Pa. 1999).

Upon review, we find that the trial court's questions to the victim were an appropriate exercise of its discretion to both clarify her response to the Commonwealth's initial inquiry and ensure that the jury did not hear inadmissible speculative testimony. The record does not support Appellant's contention that these three brief questions in any way usurped or encroached upon the fact-finding function of the jury. *See id.* Accordingly, Appellant's first claim of error must fail.

**B.**

Appellant next argues that his constitutional right to confrontation under the Sixth Amendment to the United States Constitution was violated when the trial court denied his attempt to cross-exam the victim with regards to her unrelated custody dispute. Appellant's brief at 42.

"[W]hether a defendant was denied his right to confront a witness under the confrontation clause of the Sixth Amendment is a question of law for which our standard of review is ***de novo*** and our scope of review is plenary." ***Commonwealth v. Tejada***, 161 A.3d 313, 317 (Pa.Super. 2017) (citation and internal quotation marks omitted).

The Sixth Amendment ensures that during a criminal prosecution, "the accused shall enjoy the right to ... be confronted with the witnesses against him [and] to have compulsory process for obtaining witnesses in his favor." U.S.Const. amend. VI. It is important to recognize, however, that "trial courts retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant." ***Commonwealth v. Rogers***, 250 A.3d 1209, 1216 (Pa. 2021) (citation omitted).

Here, our review of the record establishes that Appellant was afforded ample opportunity to cross-exam and confront the victim at trial, ***see*** notes of testimony, 10/19/21 at 22-165, and was only precluded from introducing irrelevant custody documents wholly unrelated to the matter at hand. As the trial court reasoned it in opinion,

> there is no link between the accusations made by [the victim] against Appellant and a custody agreement between herself and the children's father who is not Appellant. As Appellant is not children's father, it is

> unfathomable to reconcile how going to the police and making up a story of being raped by someone other than the children's father would benefit [the victim's] custody proceedings

Trial court opinion, 7/7/23 at 21.

Based on the foregoing, we find that Appellant's second claim of trial court error must fail.

## C.

Appellant next argues that the trial court abused its discretion in denying his request for a "missing witness" jury instruction with respect to the victim's two neighbors whom she identified in her initial statement to police. Appellant's brief at 46.

> It is well-settled that the trial court has wide discretion in fashioning jury instructions. The trial court is not required to give every charge that is requested by the parties and its refusal to give a requested charge does not require reversal unless the appellant was prejudiced by that refusal.

*Commonwealth v. Williams*, 176 A.3d 298, 314 (Pa.Super. 2017) (citations omitted), *appeal denied*, 187 A.3d 908 (Pa. 2018). "In reviewing a jury charge, we determine whether the trial court committed a clear abuse of discretion or an error of law which controlled the outcome of the case." *Id.*

Upon review, we discern no abuse of discretion on the part of the trial court in electing not to give a "missing witness" instruction to the jury. This Court has long recognized that a missing witness jury instruction is appropriate "when a potential witness is available to only one of the parties to

a trial, it appears this witness has special information material to the issue, and this person's testimony would not merely be cumulative[.]" **Commonwealth v. Miller**, 172 A.3d 632, 645 (Pa.Super. 2017) (citation and internal brackets omitted), **appeal denied**, 183 A.3d 970 (Pa. 2018).

> However, a trial court may decline to issue this instruction **if the uncalled witness is equally available to both parties, not within the control of the party against whom a negative inference is sought, or there is a satisfactory explanation as to why the party failed to call the witness.**

**Commonwealth v. Crumbley**, 270 A.3d 1171, 1185 (Pa.Super. 2022) (citation omitted; emphasis added), **appeal denied**, 284 A.3d 884 (Pa. 2022).

Here, the record reflects that a "missing witness" jury instruction was not warranted in this case because the potential witnesses at issue were equally available to both parties. In her initial statement to police, the victim indicated that she ran to her neighbors across the street the morning after Appellant sexually assaulted her, but never identified these neighbors by name prior to trial. Notes of testimony, 10/19/21 at 114. In fact, the only known characteristics of these potential witnesses prior to trial was that they lived across the street from the victim. The victim identified one of her neighbors as "Ms. Shirley," but acknowledged on cross-examination that she did not know her neighbors beyond "coming and going" and that with respect to Ms. Shirley, "I said whatever name I think is her name, but I'm still not

sure." *Id.* at 115. The victim further testified that "[n]one of these neighbors are here to testify and verify any of this information[.]" *Id.* at 116.

Based on the forgoing, we find that Appellant was not prejudiced by the trial court's decision to forgo a "missing witness" jury instruction. Accordingly, Appellant's third claim of trial court error fails.

**D.**

Lastly, Appellant contends that the trial court violated his Fifth Amendment right to remain silent during the sentencing phase and improperly considered his silence when fashioning his sentence. Appellant's brief at 51. This claim is baseless.

"The Fifth Amendment was enacted to protect against self-incrimination, whether [the suspect is] in custody or not, charged with a crime, or merely being questioned during the investigation of a crime." *Commonwealth v. Molina*, 33 A.3d 51, 63 (Pa.Super. 2011) (*en banc*) (citation omitted), *affirmed*, 104 A.3d 430 (Pa. 2014). This Court has recognized that the Fifth Amendment's privilege against self-incrimination prohibits the court from construing the defendant's silence during sentencing "as indicative of his failure to take responsibility for the crimes of which he was convicted[,]" or as "the sole basis for finding that the defendant lacked remorse." *Commonwealth v. Bowen*, 975 A.2d 1120, 1121, 1127 (Pa.Super. 2009)

In the instant matter, our review of the hearing and sentencing transcripts as a whole reveal that the trial court did not violate Appellant's

Fifth Amendment right to remain silent nor consider his silence when sentencing him. On the contrary, the record reflects that the trial court merely ensured that it was Appellant, rather than his counsel, that made the decision to invoke his rights under the Fifth Amendment, and it did not take into consideration Appellant's voluntary choice to do so in fashioning his sentence. *See* notes of testimony, 1/13/22 at 8-14; notes of testimony, 5/24/22 at 54-59. Appellant's claim to the contrary is baseless.

Based on all of the foregoing, we affirm the trial court's May 24, 2022 judgment of sentence.

Judgment of sentence affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 8/19/2024